CHIEF JUSTICE McGRATH
delivered the Opinion of the Court.
¶1 Anne Marie Stout (Stout) appeals from her conviction and life sentence for the crime of deliberate homicide arising from the death of her husband Bill. We affirm the conviction and life sentence.
¶2 Stout presents the following issues for review:
¶3 Issue One: Whether the District Court properly allowed the expert reports that had been admitted into evidence into the jury room during deliberations.
¶4 Issue Two: Whether the District Court properly admitted evidence at trial concerning Stout’s attempts to falsely implicate another woman in a campaign to harass and intimidate Stout’s husband and family.
¶5 Issue Three: Whether the District Court properly admitted opinion testimony from a police officer concerning blood evidence at the scene.
¶6 Issue Four: Whether the District Court erred in refusing to suppress evidence seized under the authority of a search warrant from a motorcycle saddlebag.
¶7 Issue Five: Whether the District Court had jurisdiction to order that the sentence be modified after conclusion of the appeal to include reimbursement for costs of appellate counsel.
BACKGROUND
¶8 Bill and Anne Stout lived in a rural area near Darby, Montana, with their two teen-aged sons, one of whom was attending college out of state. Bill died in their home from a single gunshot wound to the head on June 9,2007, between 10:00 p.m. and midnight. Anne and Bill *470 had been alone in the house that evening until their younger son returned home about midnight. Bill planned to go horseback riding with a friend the next day, and at about 10:00 p.m. talked to the friend by phone about the outing. Stout claimed that she spent the night of June 9 with Bill in their bedroom and that he was not feeling well the next morning. When Bill’s friend called the next morning about the ride, Stout told him Bill was ill and was not going to go.
¶9 On June 10, Stout and the younger son drove to Missoula for a shopping trip, returning home late in the afternoon. The younger son did not see his father the prior evening, or before leaving for Missoula with Stout the next morning. She and the son arrived home from the shopping trip to find Bill’s body in bed. She called 911 about 4:30 p.m. ¶10 The murder weapon was a pistol owned by Bill. Ten days before his death he reported to the Ravalli County Sheriff that the pistol, holster and ammunition were missing. Ambulance personnel and officers who responded to the 911 call from Stout confirmed that Bill was dead and that no gun was found in the room with him. Officers applied for and obtained a search warrant. The gun was subsequently located in the saddlebag of Bill’s motorcycle in the garage of the house. The holster was found in a laundry hamper under washed but wet clothing, and the ammunition was found on top of Bill’s gun safe. Three rounds were missing from the center of the box, so that unless the box was completely opened it appeared upon opening from the end that it was full.
¶11 Officers found what appeared to be a laundry washing project that was never finished. Wet laundry, smelling strongly of bleach, was in the hamper but had not been dried. A neighbor whose window faced Bill and Anne’s house reported seeing lights on in the bedroom area in the middle of the night, on the night before Anne and the son went to Missoula. The neighbors felt that seeing the light on at that time and location was unusual.
¶12 The bullet that killed Bill and the spent shell casing were recovered from the bed where he was found. A spent shell casing from the pistol was found in the yard, and an un-fired round was in the chamber of the pistol, accounting for the three rounds missing from the ammunition box. Expert botanical examination of a plant blossom found in the ammunition box showed it came from a bush in the yard that had first bloomed for the season at least six days after Bill reported the gun missing. Expert analysis showed that the two spent shell casings came from Bill’s gun, as did the bullet that killed him. Stout testified that she did not know anything about the blossom in the *471 ammunition box, but that she assumed that the expert’s analysis of it was correct. At the time of the search both Stout and her son told officers that Bill’s gun was missing.
¶13 The search also revealed a latex glove imbedded with gunshot residue on the outside and Stout’s DNA on the inside. The glove was located in the same laundry hamper as the holster and wet laundry, but Stout testified that she did not know how her DNA got inside the glove. She later testified that she often used rubber gloves around the house, which would explain her DNA, but that she still had no idea how gunshot residue got onto a glove with her DNA in it. Stout testified that she had nothing to do with the gun or the holster and did not know how they ended up in the locations where officers found them. Investigating officers recovered no fingerprints from the gun or ammunition. There was no gunshot residue on Bill’s hands.
¶14 The search also revealed a note in Stout’s handwriting in her nightstand that contained apparent instructions on how to fire a pistol like the one used in the crime. She claimed that the note was actually a guide for their college-age son for using the clothes washer. Her computer showed 56 internet searches for such topics as how to kill someone, how to poison someone and get away with it, and how to put a person to sleep. Stout testified that she believed that these were Bill’s searches and showed that he planned to commit suicide. Stout was the beneficiary of a $500,000 term life insurance policy that Bill had taken out two years before his death, and was co-owner of their real estate with equity over $500,000.
¶15 The investigation also revealed that during a 2005 trip to Arkansas, Bill had a brief affair with a woman he had known years before named Barbara Miller. Bill and Miller continued to communicate after Bill returned to Montana, and he bought a plane ticket for her to fly into Kalispell, Montana, although that trip and meeting never happened. Miller testified that she and Bill had discussed getting married and that she planned to move to Montana when that happened.
¶16 Stout later found out about the relationship between Bill and Miller through a phone call from a female person who Stout said she did not recognize. She had a confrontation with Bill over the affair and he agreed to terminate contact with Miller. Shortly thereafter (still in 2005), Bill, Anne, their sons, and a number of their friends began receiving emails or letters postmarked in Arkansas purporting to be from Miller or from Miller’s daughter. The communications deprecated Anne Stout, touted the relationship between Bill and Miller and *472 claimed that it was an ongoing affair. They claimed that Miller was pregnant with Bill’s child, and claimed that Miller was going to move to Montana to take Anne Stout’s place in the family. The communications claimed that Miller was going to bring Bill’s baby to Montana. Other communications, including letters postmarked in Arkansas, purported to invite the family and friends to a barbecue in Montana to celebrate the relationship between Bill and Miller. Bill reported the purported Miller harassment to law enforcement in Ravalli County. Stout told a number of people about Bill’s relationship with Miller, and it was a source of intense shame and embarrassment for him. These purported communications from Miller continued sporadically until June, 2006. None of the communications ever went to members of Stout’s family.
¶17 The investigation showed that the email accounts from which the purported Miller messages were sent were created on Stout’s work computer, and that some of the emails had been sent from her home computer. Investigators were able to duplicate a Ft. Smith, Arkansas postmark like the ones found on letters purporting to be from Miller by mailing a stamped and addressed letter in a manila envelope from Hamilton, Montana to the postmaster in Ft. Smith, Arkansas. During the search immediately after Bill’s death in 2007, officers found two letters with Arkansas postmarks in Anne’s car in the garage, one sealed and one un-sealed, like the others that had started appearing in 2005.
¶18 Stout’s was the only DNA found on the adhesive of an envelope postmarked from Arkansas, purporting to be from Miller and inviting Bill’s work partner to the barbecue. The sealed Ft. Smith, Arkansas envelope found in Stout’s car during the search contained printed-out emails purporting to be from Miller. Those print-outs contained Stout’s fingerprints and palm print. She testified that she did not dispute that her DNA was on the adhesive of the Arkansas envelopes but that she had no idea how it got there. She testified that she could have unknowingly handled the contents of the Arkansas mailings because she sometimes helped Bill with paperwork. During the search after Bill’s death, officers found in the Stouts’ bedroom a copy of a purported invitation to the barbecue addressed to their sons. Handwriting on the invitation, purportedly from Miller in Arkansas, was identified as Stout’s by handwriting analysis, to a high probability.
¶19 In addition to the mailings and emailings, there were several acts of petty vandalism such as eggs or feces smeared on Bill’s truck and broken potted plants on the porch of the house. Bill and Anne reported *473 receiving numerous hang-up phone calls. The subsequent investigation showed that those calls had been made from a pay phone in the hall of the business where Stout worked. Bill also reported that a credit card and some financial information were missing from the house and stated that he feared that Miller had come to Montana and had broken in. Bill received emails purporting to be from Miller stating that she was going to come to Montana, and reported his fears about Miller to the sheriffs office. Investigating officers found no evidence that Miller ever came to Montana prior to testifying at Stout’s trial.
¶20 As recently as seven months before Bill’s death, Stout conducted internet searches related to Miller and to Bill on her work computer and used that computer to create an online account in Miller’s name. Stout and Miller also periodically talked by phone in conversations initiated by Stout. She also called and emailed Miller’s boss about the affair, and Miller became concerned that she would lose her job if Stout obtained a restraining order against her as Stout threatened. Stout testified that she never sought a restraining order against Miller and never told anyone that she had. Other witnesses testified that she had told them about a restraining order. As recently as six months before Bill’s death, Stout called Miller to report that she was divorcing Bill. Miller concluded that Stout was very angry about Bill’s relationship with her.
¶21 Shortly after Bill’s death, Stout and her two sons named Miller to investigating officers as a person who had an affair with Bill and who had been stalking the family. Stout told officers that Miller’s harassment was a great concern to Bill and that not long before his death he believed that a car that turned into their driveway during the night was Miller or one of her family members. Acquaintances of Bill also told officers about the purported Miller stalking, having heard about it repeatedly from Stout. Miller was eliminated as a suspect based upon a store surveillance video that showed that she was in Arkansas at about the same time that Bill was shot.
¶22 A central theme of the prosecution was that Stout deliberately and methodically created the illusion, beginning in 2005 and continuing up until the investigation of Bill’s death, that the family had been victimized and stalked by Miller.
¶23 Stout testified that she never made the phone calls that Miller reported, that she never sent mailings to anyone with Arkansas postmarks, that she had no idea how her DNA got onto the envelopes, and that she never created any of the purported Miller emails traced to her computer. She testified that after she found out about the Miller *474 affair she discovered that Bill had bought an airline ticket for Miller to come to Montana; that Bill and Miller were talking by phone; that Bill had bought phone calling cards she did not know about; that Bill had registered with an on-line dating service in 2004; and that Bill had obtained a post office box that she did not previously know about. She testified that she was angry and humiliated. Investigating officers found a list Anne had kept, apparently for years, of all the “really mean things” Bill had ever said to her.
¶24 Stout was charged by information with deliberate homicide on June 26,2007. She presented expert testimony that the circumstances of Bill’s death were consistent with either suicide or homicide. After a three-week trial, a jury found her guilty in June, 2008. The District Court committed her to prison for life in September, 2008.
DISCUSSION
¶25 Issue One: Whether the District Court properly allowed the expert reports that had been admitted into evidence into the jury room during deliberations.
¶26 At the conclusion of the evidence and closing arguments, the trial judge and attorneys met to organize the several hundred pieces of evidence that had been admitted during the trial and to resolve any issues of which exhibits could be taken into the jury room during deliberation. There was no objection from either side to sending the vast majority of the exhibits with the jury during deliberations. This Court reviews a district court’s decision on exhibits that may be taken to jury deliberations for an abuse of discretion. State v. Bales, 1999 MT 334, ¶¶ 12, 25, 297 Mont. 402, 994 P.2d 17.
¶27 The record of these discussions shows that the District Court excluded several exhibits from the jury deliberations upon objection by the defense. For example, the defense successfully objected that a photograph that a witness had marked during testimony placed undue emphasis on that witness and should be excluded in favor of an unmarked copy of the same image. The defense successfully excluded two drawings done during testimony by prosecution experts on the ground that they had been admitted “just for demonstrative purposes.” At the same time the defense argued that the audio recordings of several witness interviews that had also been transcribed should be given to the jury. The prosecution and District Court agreed and the recordings went with the jury.
¶28 The defense objected to Exhibits 226 through 238, characterized as “various reports from the laboratories” on the ground that allowing *475 the jury to see the reports would put “undue emphasis” on them or the witnesses. Each of the exhibits had previously been admitted into evidence. The only report the defense specifically objected to was the “Autopsy Report,” but only to the extent that it contained the conclusion that Bill’s death was a homicide. The District Court concluded that there was no “unfair prejudice” in sending the reports with the jury, and that the homicide conclusion in the autopsy report was “made clear in testimony, so it’s no surprise.”
¶29 Stout contends that the expert reports were “testimonial evidence” that should have been excluded from jury deliberations. She does not contend that the reports were erroneously admitted into evidence during the trial. When jurors retire for deliberation, they may take with them “all exhibits that have been received as evidence in the cause that in the opinion of the court will be necessary.” Section 46-16-504, MCA. At the same time, this Court has recognized the common law rule against submission of “testimonial materials” to the jury for “unsupervised and unrestricted review.” State v. Herman, 2009 MT 101, ¶ 38, 350 Mont. 109, 204 P.3d 1254. That rule applies both as to materials sent with the jury at the start of deliberations, and to requests from the jury to re-hear testimony during deliberations as provided in § 46-16-503(2), MCA. Bales, ¶ 23. A district court’s decision under § 46-16-504, MCA, on evidence that may be taken by the jury during deliberations is reviewed for abuse of discretion. Bales, ¶ 24.
¶30 This Court has tended to identify “testimonial materials” for purposes of the common law rule by analogy. In Bales, ¶ 16, we quoted a definition of the phrase “testimonial evidence” from Black’s Law Dictionary. The current Ninth Edition of that work defines “testimonial evidence” as a “person’s testimony offered to prove the truth of the matter asserted; esp., evidence elicited from a witness. Also termed communicative evidence; oral evidence.” Black’s Law Dictionary 640 (Bryan A. Garner ed., 9th ed., West 2009). Therefore for purposes of this rule, the terms “testimonial materials” and “testimonial evidence” have been treated as equivalents.
¶31 Further illustration of the intent and meaning of these terms comes from the cases in which this Court has considered issues of what materials can be provided to a jury during deliberations. The disputed testimonial evidence in Bales was the tape recording of a police interview with a defendant. Similarly, in Herman the disputed testimonial evidence was the written statement by a witness; in State v. Mayes, 251 Mont. 358, 825 P.2d 1196 (1992), it was a tape recording of witness statements; in State v. Morse, 229 Mont. 222, 746 P.2d 108 *476 (1987), it was a surveillance tape record of the defendant; and in State v. Harris, 247 Mont. 405, 808 P.2d 453 (1991), it was the entire transcript of the victim’s testimony.
¶32 Stout asserts that expert witness reports admitted into evidence in her case were testimonial evidence that should have been excluded from jury deliberations by the common law rule noted above. However, Stout fails to provide anything more than conclusory contentions that the expert witness reports in her case constituted “testimonial evidence” as that phrase has been defined and as it has been applied in case law. She really only argues that the exhibits relate to and are consistent with testimony from various State witnesses. That, of course, would be true for most pieces of evidence admitted in most trials and forms no basis for excluding items of evidence from the jury deliberations. This is no ground for error. Nevertheless we have reviewed the State’s exhibits that she complains about and conclude that none of them is testimonial materials or testimonial evidence for purposes of the common law rule.
¶33 State’s Exhibits 226, 227, 228, 229, 231, 232, 236, and 238 are brief laboratory reports, most of them a single page, from the Forensic Science Division of the Montana Department of Justice, commonly referred to as the “State Crime Lab.” The reports briefly and summarily list technical and scientific facts resulting from the examination of evidence relating to the prosecution. Exhibit 230 is a longer report from a laboratory in Florida concerning the results of various DNA tests of evidence such as the Arkansas envelopes and the rubber glove. Like the Forensic Science Division reports, the DNA report lists and summarizes the technical and scientific facts resulting from the examination of evidence potentially containing DNA residue. Exhibits 233 and 234 were investigative reports written by Deputy Wagner of the Cascade County Sheriffs Office concerning his examination of and conclusions about the handwriting found on one of the Arkansas mailings. Exhibit 237 was a one-paragraph letter from the Assistant Herbarium Curator at the University of Montana tentatively identifying some of the plant material found in the box of ammunition for the pistol.
¶34 Exhibit 235 was the report of the postmortem examination (autopsy) of Bill’s body. This is the only exhibit that Stout specifically objected to during the exhibit conference at the end of the trial. At that time Stout contended that she was prejudiced by the exhibit, but only by the line “at the very end” of the report that said “Manner of Death: Homicide.” The District Court allowed the exhibit to go to the jury *477 because the conclusion was consistent with the author’s testimony and was “no surprise.”
¶35 The author of each of the reports testified and was cross-examined at trial. The defense either stipulated to or did not contest the expert qualifications of each of the witnesses. The jury was instructed on its power and duty to evaluate the testimony of each witness and to determine the weight it should be given. The jury was instructed specifically that expert testimony should be given the weight it deserves, and may be entirely rejected if the reasons given to support it are unsound. Trial court judges are given broad discretion to determine which exhibits would be necessary to help the jury in deciding the case. The District Court did not err by allowing these reports to accompany the jury during deliberation.
¶36 Issue Two: Whether the District Court properly admitted evidence at trial concerning Stout’s attempts to falsely implicate Miller as the source of a campaign to harass and intimidate Stout’s husband and family.
¶37 Stout contends that the District Court improperly admitted evidence of her campaign to create the illusion that Miller was stalking and harassing Bill and the family. She contends that the evidence was not related to any fact in dispute, and was inadmissible because the events did not occur immediately prior to the charged offense. This Court reviews rulings on the admissibility of evidence to determine whether there has been an abuse of discretion. State v. Paoni, 2006 MT 26, ¶ 13, 331 Mont. 86, 124 P.3d 1040.
¶38 The State contends that the Miller evidence is admissible under § 26-1-103, MCA, referred to as the transaction rule. It provides:
Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction.
The transaction rule allows admission of evidence of acts that are “inextricably or inseparably linked to,” State v. Lacey, 2010 MT 6, ¶ 31, 355 Mont. 31, 224 P.3d 1247, and are explanatory of the charged offense, State v. Derbyshire, 2009 MT 27, ¶ 41, 349 Mont. 114, 201 P.3d 811. The rule is based upon the premise that it is difficult to subdivide a course of conduct into discrete criminal acts and “other” conduct, as it is difficult for a witness to testify coherently about an event if the witness is only allowed to reference minutely defined elements of the crime. State v. Guill, 2010 MT 69, ¶ 27, 355 Mont. 490, 228 P.3d 1152. The rule allows admission of evidence that is necessary to “provide a comprehensive and complete picture of the commission of a crime.” *478 Guill, ¶ 36. All Federal circuits recognize the legitimacy of admitting properly limited relevant evidence that is intrinsic to or inextricably intertwined with a charged crime. Guill, ¶ 28.
¶39 We have cautioned that the transaction rule should not be used to admit evidence of other crimes, wrongs or acts to “prove the character of a person in order to show action in conformity therewith” as prohibited by Rule 404(b), M. R. Evid. State v. Barosik, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776, without following the requirements explained in State v. Matt, 249 Mont. 136, 814 P.2d 52 (1991). Application of the transaction rule should not be used to avoid Rule 404 and the notice and instruction requirements it specifies. Guill, ¶ 26.
¶40 Stout first argues that the evidence of her campaign to make it appear that Miller was stalking the family was inadmissible because it did not happen “immediately prior” to Bill’s murder. The phrase “immediately prior” is found in several decisions from this Court, in passages explaining the theory and purpose of the “transaction rule.” It appears to have first been used in State v. Moore, 254 Mont. 241, 246, 836 P.2d 604, 607 (1992), and was adopted from a Texas case, Cruz v. State, 645 S.W.2d 498 (Tex. App. 1982). The disputed evidence in Moore involved acts by the defendant after the crime.
¶41 The use of the phrase “immediately prior” in cases explaining the transaction rule is not a substantive temporal limitation on evidence admissible under the rule. We have never held that evidence admissible under the rule is limited to evidence of acts occurring immediately prior to the crime. See e.g. State v. Bauer, 2002 MT 7, 308 Mont. 99, 39 P.3d 689. Adoption of such a narrow interpretation would reward the plodding and methodical criminal who is capable of planning her crime over a span of months or years. The ability to do so should not be rewarded by excluding the evidence. The issue under the transaction rule is whether the evidence is inextricably linked to and explanatory of the crime. The issue is not whether the acts occurred immediately prior to the crime or at some other time.
¶42 Moreover, contrary to Stout’s characterization, her campaign to paint Miller as a dangerous stalker was not an isolated incident that occurred two years before the crime. While the campaign began in 2005, it was continuing up until the moment of Bill’s death and afterwards. Within months before Bill’s death, Stout had created another internet account in Miller’s name. She had done internet searches involving Bill and Miller. She called Miller and told her she was divorcing Bill. Copies of the spurious emails and letters that were *479 part of the campaign were found in Stout’s car during the search after the murder. When investigating officers interviewed Stout, she and her sons named Miller as someone with whom Bill had trouble. Stout’s plan did not stop in 2005 but continued up to and after the murder.
¶43 Second, Stout argues, very briefly, that the harassment evidence was inadmissible because it was not related to any fact in dispute, as required by the transaction rule. She contends that evidence of a campaign in 2005 to embarrass her husband about the affair was not evidence of the murder.
¶44 The prosecution’s theory of the case was that Stout became enraged by the affair and Bill’s apparent plan to divorce her and take up with Miller. In reaction to her anger she manufactured the Miller harassment campaign to embarrass both Bill and Miller. Stout’s anger with Bill caused the events that eventually led to the murder, and the manufactured perception that Miller had harassed the family could ensure that Miller would be the suspect in the crime. This plan worked. Stout and both her sons told investigating officers immediately after Bill’s death that Miller had been stalking the family. Officers investigated Miller as a suspect. Had she not coincidentally appeared on a store surveillance video in Arkansas at the time of the murder, Stout’s plan to drag a red herring across the trail of the investigation could have lasted much longer.
¶45 Stout’s efforts to paint Miller as a deranged stalker and murder suspect were clearly an integral part of her planning of the crime. Stout could not act on her anger toward Bill until she sufficiently indoctrinated everyone involved, including Bill and her sons, to the belief that Miller was a threat to them. She did this thoroughly and precisely. It was part of her planning of the crime itself and was clearly inextricably linked to her role in Bill’s death. The evidence that Stout manufactured the harassment campaign to implicate Miller was not evidence of “other” crimes, acts or wrongs, and thus M. R. Evid. 404(b) is not implicated. It was evidence of the crime itself and provided the essential context to prove to the jury how and why the crime occurred. ¶46 Contrary to the suggestion by the dissent, use of the transaction rule in this manner does not allow prosecutors to seek victory at the expense of a defendant’s constitutional rights. The prosecution is required to disclose to the defendant in discovery the witnesses it intends to call and the evidence it intends to introduce. Section 46-15-322, MCA. Moreover, the prosecutor is required to disclose evidence that tends to be exculpatory. State v. Licht, 266 Mont. 123, 129, 879 P.2d 670, 673-74 (1994). Finally, the prosecutor is required to conform *480 to the Montana Rules of Evidence and the defendant has the right to challenge proposed evidence throughout the trial process. No constitutional rights of the defendant are limited by the holding in this case.
¶47 We are not persuaded by the dissent’s argument that the “inextricably intertwined” requirement should be further constrained by a requirement that the transaction rule be limited to the evidence that is essential to secure a conviction. There are clear difficulties determining at trial and on appeal the line to be drawn between the evidence without which the conviction could not occur and all other evidence offered by the prosecution. Adoption of an “evidence required to convict” standard risks requiring all evidence in a criminal case apart from the narrow ultimate issues-such as who pulled the trigger-to require pretrial notice and cautionary instructions as the evidence is presented. Clearly such an obligation would present difficult and often unclear choices to the trial judge, increasing the risk of error and jury confusion, and more appeals.
¶48 Finally, the dissent misconstrues our ruling in State v. Henson, 2010 MT 136, 356 Mont. 458, 235 P.3d 1274. Rather than creating a double standard for application of the transaction rule to the prosecution and defense, Henson adopts the identical limitation on use of the rule for both. Lacey imposed restrictions on the prosecution’s use of evidence concerning conduct of or with witnesses not part of the crime being prosecuted. Henson applied that ruling to the use of such evidence by the defense.
¶49 We hold that evidence of Stout’s campaign to portray Miller as a stalker was inextricably linked to proving that she murdered Bill and was properly admitted.
¶50 Issue Three: Whether the District Court properly admitted opinion testimony from a police officer concerning blood evidence at the scene. This Court reviews rulings on the admissibility of evidence to determine whether there has been an abuse of discretion. Paoni, ¶ 13.
¶51 Stout contends that the District Court erred in allowing Matt Cashell, one of the investigating detectives, to offer his opinion that Bill’s body was moved after he was shot, based in part upon the blood stains found on and around the body. Cashell was an officer with the Ravalli County Sheriffs Department and Deputy Ravalli County Coroner. He participated in the initial crime scene investigation and testified on several separate occasions at trial.
¶52 When Cashell first appeared on June 2 early in the trial, he testified that he had a four-year degree in justice studies, was a *481 graduate of the Montana Law Enforcement Academy, and was Deputy Ravalli County Coroner. He generally described what he saw at the scene and identified the photographs he took. On cross-examination, the defense asked him a series of questions about the location and appearance of blood spots and stains on and around the body. He was also cross-examined about his examination of the body for rigor mortis and whether he came to any conclusions as a result. There was no objection during any of this testimony. He testified on subsequent occasions that are not at issue in this appeal.
¶53 On June 5 Cashell was called to testify again. He testified about specialized training he received in blood stain pattern analysis, including impact stains, transfer stains and drying times. He described that the course included lab work using human blood to evaluate the effects of blood stains and drying times. He then testified that at the scene of Bill’s death he found a large volume of blood that had substantially coagulated, explaining the difference between dried and coagulated blood. Cashell testified that in his opinion based on the coagulation and drying he saw, Bill had been dead “for some time” when he examined the body. He also described in some detail the meanings of rigor mortis and lividity, and his observations of Bill’s body that led him to conclude that Bill had been dead 8 to 12 hours or longer at the time of his observations. There was no relevant objection during any part of this testimony.
¶54 Cashell testified again on June 6. He testified that based on his observations he concluded that the body, the covers and the pillow had been moved after death. He testified that the blood stains indicated to him that the body had been moved after death. At this point the defense asked to voir dire the witness and asked him about his blood stain analysis workshop. He testified that he completed a week-long course at the State Crime Lab, taught by officials from the Kansas City Police Department and the Kansas Bureau of Investigation. Cashell indicated that he had not testified on blood stain analysis before and had authored no articles in the area. The defense then objected that Cashell was not qualified to give expert testimony because his workshop was only a week long. The District Court ruled that Cashell could state his opinion, and that the “jury can give it such weight as they feel it deserves.”
¶55 He testified that with the body as they found it, the bullet could not have traveled through Bill’s head to the position in the pillow where it was located. Therefore, he concluded that the body must have been moved after Bill was shot. He testified that as the body was *482 found, there was blood that was “actually above or against gravity from the wound” again indicating that the body had been moved. He testified that there was a defined margin or line in the blood stain on the left hand as if it had been partially in a pool of blood, but that the hand was not in a pool of blood when the body was found. The same was true in other areas of the body. He testified that there were coagulated deposits on top of blood stains, indicating that the blood had coagulated before it was deposited on the stain, again indicating body movement.
¶56 Cashell described other blood stains that were deposited when the blood was already coagulated because the blood had not run. He described the position the body would have to be in at the time of death to create the blood patterns he found. He then testified about lividity and the purple discoloration in the body, and his conclusion that the lividity had become fixed with the body in the position in which it was found. Cashell concluded that Bill had been lying on his right side when he was shot, that the body had stayed in that position long enough for blood to begin to coagulate, and that it had then been rolled over onto the back in the position in which it was found.
¶57 Cashell also testified that there was a pillow over Bill’s head when the body was found, covering the entrance wound in the head, indicating that the pillow had been moved. He testified that there were drops of blood found under the sheet, indicating that the sheet had been moved. He testified that fingerprints in the blood were left by someone other than Bill, based upon the position of the bedding and his conclusion that Bill could not have moved his hand to make the prints after he was dead.
¶58 On cross-examination, defense counsel stated that “it’s obvious, without going through any blood stain analysis, that things were moved in the room because, as you first started to testify, the one green pillow was over the entrance wound....” Defense counsel further stated that “when we look at the photos, it’s obvious someone put the bed covers over his right arm, too. ...” During closing argument, defense counsel mentioned Cashell’s testimony only once, observing: “I don’t care who moved the body. We know somebody did something because the pillows are there.”
¶59 A district court may allow expert testimony if the witness has the requisite knowledge, skill, experience, training or education to testify. Rule 702, M. R. Evid.; State v. Russette, 2002 MT 200, ¶ 14, 311 Mont. *483 188, 53 P.3d 1256.[1] The witness must have specialized knowledge that would distinguish him from a lay person. State v. Maier, 1999 MT 51, ¶ 89, 293 Mont. 403, 977 P.2d 298. The district court has great latitude in ruling on the admissibility of expert testimony, and the ruling will not be disturbed without a showing of abuse of discretion. State v. Crawford, 2003 MT 118, ¶ 30, 315 Mont. 480, 68 P.3d 484.
¶60 Stout contends that Cashell should not have been allowed to state his opinion that the body had been moved because that was “key circumstantial evidence that Bill’s death was not a suicide because someone had moved his body after death.” However, at the trial itself,' it was clear that the defense did not contest the fact that the body and bedding had been tampered with after Bill was shot. Indeed, they could not have taken any other position under the facts because a pillow was found over the entrance wound and blood was found under the sheet. Under these circumstances Stout cannot demonstrate any prejudice arising from Cashell’s testimony that the body and bedding had been moved.
¶61 Further, the District Court had great latitude in assessing the qualifications of the witness as an expert. While Stout argues now that Cashell was not an expert because he lacked a college degree in blood spatter analysis, had not testified as an expert in other trials and had not published papers on the topic, those are not pre-requisites to qualification to provide expert testimony. Cashell had a four-year degree in law enforcement, was a Law Enforcement Academy graduate, had experience as a detective and coroner, and had completed a week-long course in blood spatter evidence. This training and experience adequately qualified him to give the testimony he gave, especially in light of the fact that much of his testimony was intuitive. Much of his testimony involved propositions such as blood flows down, a discrete line in a blood stain is significant, and a pillow over the entrance wound is significant. In addition, he testified extensively and without objection as to his observations and conclusions on rigor mortis and lividity.
¶62 Last, as noted earlier, the jury was instructed that they could give expert testimony the weight they thought it deserved, and could reject it entirely if the reasons given for it were unsound. And, of course, the defense was free to present expert testimony from other witnesses *484 contesting the opinions offered by Cashell. The District Court did not abuse its discretion allowing Cashell to testify.
¶63 Issue Four: Whether the District Court erred in refusing to suppress evidence seized from a motorcycle saddlebag under the authority of a search warrant.
¶64 Stout appeals the District Court’s denial of her motion to suppress the pistol that was used to kill Bill. This Court reviews denial of a motion to suppress to determine whether the district court’s findings of fact are clearly erroneous and its interpretation of the law is correct. State v. Marks, 2002 MT 255, ¶ 10, 312 Mont. 169, 59 P.3d 369. Stout contends that the investigating officers exceeded the scope of the search warrant by seizing the gun from the saddle bag of the motorcycle in the garage. This Court reviews a district court’s denial of a motion to suppress evidence to determine whether the findings of fact are clearly erroneous and the interpretation and application of the law are correct. State v. Marks, 2002 MT 255, ¶ 10, 312 Mont. 169, 59 P.3d 369.
¶65 When officers arrived at the Stout residence and determined that Bill had been shot, they sought and obtained a search warrant. The warrant authorized the officers to search for “any firearm that could be related to the death of William Lee Stout.” The warrant described the places to be searched as
in and upon the premises residence, outbuildings and vehicles of William Lee Stout and Anne Marie Stout, located at 266 Trapper Meadow Road, Darby, MT 59840 and described as a single story single family dwelling of frame construction with natural wood colored siding and having brown asphalt shingle roofing with a partial basement and an attached garage. The residence has a “Gone Fishing” sign on the east side of the door. The vehicles of William Stout and Anne Marie Stout are one red 2000 Ford truck ..., one 1995 green Chevrolet Suburban ..., one 2000 White Trails West Horse Trailer ..., and one black Honda passenger car ....
The warrant concluded that the Justice of the Peace was “satisfied that there is probable cause to believe that the property described [i.e., the gun and other items that were the object of the search] is in the said premises residence, outbuilding, and vehicles of William Stout and Anne Marie Stout described above.”
¶66 Stout contends that the officers could not search the saddlebags of the motorcycle found inside the garage because the motorcycle was not specifically listed in the search warrant as a one of the Stout vehicles. Stout does not contend that there was not probable cause to *485 issue the search warrant or that the items to be seized were not properly described. Her contention is that the officers exceeded the scope of the warrant by looking into the motorcycle saddlebag. The District Court denied Stout’s motion to suppress, holding that the premises to be searched were described with particularity as including the attached garage, and that “a search of the garage and whatever containers and receptacles were located in the garage that might hold a firearm related to the death of Bill Stout was permissible.” The District Court also concluded that the warrant authorization to search the “vehicles of William Lee Stout and Anne Marie Stout” was “sufficiently particular to include the motorcycle at issue.”
¶67 Stout cites and quotes only marginally relevant cases dealing with warrantless searches, but her primary contention is that since the warrant lists several specific vehicles, the general authorization in the warrant to search “vehicles” must be read to apply only to the ones specifically listed. She contends that the “warrant’s plain language excluded [the motorcycle] from the authorized search.”
¶68 We cannot adopt Stout’s cribbed reading of the warrant. The warrant authorized a search of the premises, specifically including the garage and vehicles. Under established law that alone would be sufficient to permit the search of any vehicles found on the premises. U.S. v. Percival, 756 F.2d 600, 612 (7th Cir. 1985); U.S. v. Duque, 62 F.3d 1146, 1151 (9th Cir. 1995); U.S. v. Gamboa, 439 F.3d 796, 807 (8th Cir. 2006). The fact that the warrant went on and described four particular vehicles does not alter the conclusion that the motorcycle bags were subject to search. While Stout argues that the warrant should be construed to allow a search of the listed vehicles and only the listed vehicles, the warrant does not say that. We see no reason to add language to an otherwise valid and particular warrant.
¶69 The District Court properly denied the motion to suppress and properly admitted the evidence of the pistol at trial.
¶70 Issue Five: Whether the District Court had jurisdiction to order that the sentence be modified after conclusion of the appeal to include costs of appellate counsel.
¶71 Following Stout’s conviction, the District Court entered an Amended Judgment and Commitment sentencing her to life in prison. The District Court also ordered her to pay the costs of her public defender in the amount of $57,127. That amount of reimbursement was stipulated between the prosecution and Stout, and she does not contest this order. Five days later the District Court entered a second order re-stating the stipulated amount and further ordering that the *486 amount “shall be increased, if her conviction is affirmed, on appeal, by assessing all hours incurred by the Montana Office of Public Defender attorneys from January 1,2009, until completion of the appeal.” Stout contends on appeal that the District Court lacked power to order the sentence to be so modified in the future. We agree.
¶72 This Court reviews sentence conditions for legality. State v. Stiles, 2008 MT 390, ¶ 13, 347 Mont. 95, 197 P.3d 966. Section 46-8-113, MCA, allows a court to impose repayment of the costs of assigned counsel as a condition of a sentence, limited to “costs incurred by the office of state public defender ... for providing the defendant with counsel in the criminal proceeding.” The District Court was within its power under this statute ordering Stout to reimburse the defense costs of $57,127 incurred through the trial. However, the subsequent order that the amount could be increased if there were an appeal and if the conviction were affirmed failed to specify the amount of reimbursement required. It also failed to specify how disputes over the reimbursement amount would be resolved and how the amount of reimbursement would be memorialized in a sentencing document.[2]
¶73 Therefore, it is clear that at some point in the future the District Court would have to modify the sentence as to reimbursement of defense costs. However, “no statutory authority exists for the District Court to reserve authority for itself to modify the sentence regarding reimbursement of court-appointed counsel once it has been imposed. The District Court lacks the authority to revisit the matter at a latter hearing.” State v. Hirt, 2005 MT 285, ¶ 20, 329 Mont. 267, 124 P.3d 147. It is evident that the portion of the order requiring reimbursement of appeal costs would require the District Court to revisit the matter in the future. Therefore any portion of the sentence below that requires Stout to pay reimbursement for “all hours incurred by the Montana Officer of Public Defender attorneys from January 1, 2009, until completion of the appeal” is hereby vacated. However, the District Court could, upon a proper record and by specifying the amount, order restitution for future costs. See e.g. State v. Benoit, 2002 MT 166, 310 Mont. 449, 51 P.3d 495. We remand to the District Court for the sole purpose of entering a new order concerning reimbursement of defense costs on appeal consistent with this opinion.
*487 ¶74 Stout’s conviction is affirmed. The portion of her sentence dealing with reimbursement of attorney costs on appeal is vacated and remanded to the District Court for entry of a new order consistent with this opinion.
JUSTICES MORRIS, COTTER and RICE concur.

Russette states that an expert must be qualified by “knowledge, skill, experience, training and education.” (Emphasis added.) This is an incorrect statement of the law of Rule 702, which lists the possible areas of qualification in the disjunctive.

 Disputes could clearly arise as to the number of hours expended upon appeal, the hourly rate and other matters. Prior to finally settling the amount, the parties disputed the trial counsel reimbursement amount, prompting a petition for supervisory control to this Court.