FILED

11/01/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0389

DA 20-0389

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 218

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

GREGORY SCOTT GREEN,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 19-429
Honorable Jessica T. Fehr, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Chad Wright, Appellate Defender, Michael Marchesini, Assistant
Appellate Defender, Helena, Montana

       For Appellee:

              Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

              Scott Twito, Yellowstone County Attorney, Ann-Marie McKittrick,
Deputy County Attorney, Billings, Montana

Submitted on Briefs:  July 13, 2022

Decided:  November 1, 2022

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Gregory Scott Green (Green) appeals a Thirteenth Judicial District Court order denying Green's motion to prevent silent security camera footage from being made available to the jury during deliberations and subsequent Judgment of guilty for the charge of deliberate homicide.

¶2      We restate the issue on appeal as follows:

*Did the District Court abuse its discretion in allowing the jury to review silent video footage during deliberations?*

¶3      We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶4      The State charged Green with the deliberate homicide of his former girlfriend, Laura Johnson (Johnson), after a neighbor's security camera captured footage showing Johnson enter the residence she shared with Green and fail to subsequently emerge followed by footage of Green undertaking various suspicious activities.

¶5      Johnson moved in with Green in Billings near the end of the summer of 2018.  On September 4, she texted her father that she and Green had broken up and that she was staying in the "back bedroom" of Green's trailer until she could get her own apartment. On Thursday, September 13, Johnson worked her shift as a delivery driver for Papa John's. A neighbor's surveillance video mounted on a residence across the street from and pointed in the direction of Green's garage and trailer captured Johnson coming home from work and entering Green's trailer, while Green was in the yard.  Though the video footage had frequently captured Johnson entering and exiting Green's trailer up to this point, no footage

2

after this moment ever shows Johnson leave the residence alive. Johnson was never seen or heard from following September 13, 2018.

¶6     The footage depicts Green engaged in unusual activity at the house that night and the following day, including carrying a large, heavy object with both arms, cradle style, and placing it into the back seat of his truck, loading the truck with a shovel and other items, including what appeared to be two red suitcases, and lighting one object on fire in the driveway before driving off. The next day, a Saturday, Green again placed a shovel into the back of the truck before leaving for much of the day.

¶7     A Wal-Mart surveillance camera showed Green, with a large abrasion on his cheek, purchasing a paint tray on the night of September 13. Cell phone records from Johnson's cell phone, which typically contained a significant number of outgoing and incoming calls, had no call activity after September 13. Her phone GPS began moving after surveillance footage showed Green driving his truck away from the residence subsequent to loading it with various items on September 14, before ceasing to emit a signal. Upon examining Green's residence pursuant to a search warrant, police noted that the carpet in the back bedroom where Johnson had lived appeared to have been hastily replaced. New cardboard had been placed over the garage windows. When police interviewed Green, he stated that he had returned home on September 12 or 13 to find Johnson's vehicle in the garage as usual and discovered that Johnson had taken her two red suitcases and left, which he attributed to her struggles with addiction. He denied having left his home to go anywhere outside of work in the days following Johnson's disappearance. When police confronted Green with the contradictory information gained from the surveillance video, which—in

3

addition to showing him taking multiple trips after September 13—showed him moving Johnson's vehicle from the driveway into the garage and carrying what appeared to be her two red suitcases out to the truck, Green stopped the interview.[1]  The next day, Green left Billings in the white Buick that Johnson had formerly driven, and was eventually tracked going to Henderson, Nevada.  He also abandoned his job.

¶8      Forensic testing indicated the presence of blood on the inside edge of the rear driver's side door of the pickup truck Green had been seen loading.  DNA testing revealed a high likelihood that the blood came from a biological child of Johnson's parents.

¶9      Before trial, Green filed a motion in limine to prevent the video footage from the neighbor's surveillance camera from going into deliberations with the jury.  The District Court denied this motion, finding that the silent video was akin to a series of photographs and was not testimonial.  However, the District Court granted Green's request that the State and its witnesses be precluded from offering any interpretation of the video's contents prior to closing argument.[2]

---

[1] Later that day, as police were giving Green a copy of a search warrant, Green responded, "[n]o, not yet" when asked if he was "ready" to "do the right thing" and "go for that drive [to locate Johnson's body]."

[2] At a separate pretrial hearing, the District Court heard testimony on Green's motion to preclude enhancement of the video.  The State had made a copy of the surveillance footage with a picture-in-picture view enlargement of the portion of the video frame containing Green's house and driveway.  The testimony indicated that, as it was impossible to add data to enhance an image, the change had simply enlarged the pixels, without adding any new data.  Moreover, the State's witness explained that transferring the data onto a different hard drive had resulted in the images being displayed as "a hair brighter."  The District Court denied Green's motion, finding there was no alteration of the actual data.

¶10 At the end of a seven-day trial, the prosecution offered a closing argument that included its theory of the case that the security camera footage showed Green carrying Johnson's body into the truck.[3] Defense counsel argued in closing that Johnson's disappearance was due to her struggles with addiction and mental health and contended that the State's evidence failed to prove beyond a reasonable doubt that Green had killed Johnson. The jury was given the silent security camera footage and instructions for operating the viewing system, which included how to zoom in on portions of the video frame. After three hours of deliberation, the jury found Green guilty of deliberate homicide. The District Court sentenced Green to Montana State Prison for 100 years. Green appeals.

**STANDARD OF REVIEW**

¶11 We review a district court's decision allowing exhibits to be taken into jury deliberations for an abuse of discretion. *State v. Stout*, 2010 MT 137, ¶ 26, 356 Mont. 468, 237 P.3d 37 (citing *State v. Bales*, 1999 MT 334, ¶¶ 12, 25, 297 Mont. 402, 994 P.2d 17). An abuse of discretion occurs when a court acts arbitrarily, unreasonably, or without the employment of conscientious judgment, resulting in substantial injustice. *State v. Nordholm*, 2019 MT 165, ¶ 8, 396 Mont. 384, 445 P.3d 799.

---

[3] At trial, the State's witnesses followed a District Court order requiring them to refrain from interpreting the contents of the video. However, detectives did indicate that, after viewing the footage, they believed they were dealing with a homicide and had attempted to locate where Green had gone on September 14, 2018, in an effort to discover a burial site.

**DISCUSSION**

¶12     *Did the District Court abuse its discretion in allowing the jury to review silent video footage during deliberations?*

¶13     Green argues on appeal that the District Court abused its discretion by allowing the silent video footage from the neighbor's security camera to go back to the jury room during deliberations. As a general rule, "[u]pon retiring for deliberation, the jurors may take with them the written jury instructions read by the court," their own notes taken during the trial, and "all exhibits that have been [admitted] as evidence" during the trial and which "in the opinion of the court will be necessary" to their deliberations. Section 46-16-504, MCA; *State v. Hoover*, 2021 MT 276, ¶ 16, 406 Mont. 132, 497 P.3d 598.

¶14     A common law limitation, not displaced by § 46-16-504, MCA, generally disallows unsupervised or unrestricted jury review or replay of witness testimony or other evidence that is "testimonial in nature" during deliberations. *Hoover*, ¶ 16. We have applied this rule to audio recordings of a police interview, *see Bales*, ¶¶ 9, 24, written witness statements, *see State v. Herman*, 2009 MT 101, ¶¶ 14, 39, 350 Mont. 109, 204 P.3d 1254, audio recordings of witness statements, *see State v. Mayes*, 251 Mont. 358, 374, 825 P.2d 1196, 1206 (1992), transcripts of testimony, *see State v. Harris*, 247 Mont. 405, 416-18, 808 P.2d 453, 459 (1991); *State v. Greene*, 2015 MT 1, ¶¶ 9, 21, 25, 378 Mont. 1, 340 P.3d 551; *State v. Evans*, 261 Mont. 508, 510-13, 862 P.2d 417, 418-20 (1993), video footage with audio of a defendant's police interrogation, *see Hoover*, ¶¶ 4, 5, 21, and police body camera videos that captured conversations between an officer and the defendant and other witnesses. *See Nordholm*, ¶¶ 6, 10-11. *See also Stout*, ¶ 30 (citing *Black's Law Dictionary*

640 (Bryan A. Garner ed., 9th ed., 2009) definition of "testimonial evidence" as a "person's testimony offered to prove the truth of the matter asserted; esp., evidence elicited from a witness. Also termed communicative evidence; oral evidence"). The rule serves to prevent a jury from placing "undue emphasis" on testimonial evidence reviewed during deliberation "to the exclusion of the evidence presented by other witnesses" for which the jury must rely upon its collective memory during deliberations. *Nordholm*, ¶ 10; *Hoover*, ¶ 16 (citing *Nordholm*, ¶ 14; *Harris*, 247 Mont. at 416, 808 P.2d at 459).

¶15     Green does not argue that the silent surveillance video footage at issue is "testimonial" or "testimonial in nature" as we have used the term for purposes of determining whether an item should be made available to the jury during deliberations. It contains no recorded communications from one person to another, either in verbal, written, or any other communicative form. However, Green argues on appeal that even evidence that is not testimonial or testimonial in nature may be improper for jury review during deliberations if the risk of undue emphasis is sufficiently great, as Green contends was the case here. Green points to no cases in which we have even considered the risk of undue emphasis stemming from allowing an exhibit not deemed to be testimonial or testimonial in nature to accompany the jury into the jury room for deliberations. *Cf. Hoover*, ¶ 18 ("[T]he threshold question . . . is whether the subject item is either testimony or testimonial in nature. If not, the common law rule . . . do[es] not apply." (citations omitted)); *Chambers v. State*, 726 P.2d 1269, 1275 (Wyo. 1986). ("Allowing the jury to review *testimonial*

7

materials during deliberations is another matter entirely." (emphasis in original) (cited by *Harris*, 247 Mont. at 416, 808 P.2d at 459).[4]

¶16    The undue emphasis concern underlying the common law rule at issue is focused on the possibility that a jury "may not accord adequate consideration to *controverting* testimony received from *live* witnesses." *See State v. Christenson*, 250 Mont. 351, 361, 820 P.2d 1303, 1310 (1991) (emphasis added). Human witnesses, unlike most properly authenticated and admitted exhibits, may not accompany the jurors into deliberations. *Compare* § 46-16-503(1), MCA ("When the jury retires to consider its verdict, an officer of the court must be appointed to . . . prevent conversations between the jurors and others.") *with* § 46-16-504, MCA (allowing the jury to take "all exhibits that have been received as evidence in the cause that in the opinion of the court will be necessary" into deliberations). As a result, sending records of some, but not all, witness testimony into the jury room would create a fundamental asymmetry between the testimony of some persons relative to others, a problem of particular concern when witnesses attest to the existence of contradictory facts. This potential for selective reviewability artificially tipping the scales on contested facts is diminished with regard to exhibits that are not testimonial or testimonial in nature, as the wide swath of properly authenticated and admitted exhibits offered in the case may generally, subject to independent limitations not at issue here, be

---

[4] Of course, we have considered whether graphic photographs of crime scenes can be overly prejudicial. *See, e.g.*, *State v. Doll*, 214 Mont. 390, 398-400, 692 P.2d 473, 477-78 (1985) (citing M. R. Evid. 403); *State v. Devlin*, 251 Mont. 278, 283, 825 P.2d 185, 187-88 (1991) (citing M. R. Evid. 403); *State v. Langford*, 267 Mont. 95, 105-06, 882 P.2d 490, 496 (1994) (citing M. R. Evid. 403).

made available to juries during deliberation under § 46-16-504, MCA. *See United States v. Salerno*, 108 F.3d 730, 745 (7th Cir. 1997) ("As long as the district court is evenhanded in its evidentiary rulings, it has wide discretion in determining whether an exhibit will be allowed to go into the jury deliberation room." (citation and internal quotation marks omitted)); *United States v Chadwell*, 798 F.3d 910, 914 (9th Cir. 2015) (noting that jury is generally "entitled to view paper exhibits, photographs, and physical exhibits" during deliberations); *Christenson*, 250 Mont. at 361, 820 P.2d at 1309 (noting that exhibits that are not testimonial in nature are "evidence which at the discretion of the court could be allowed" into jury deliberations).

¶17 Here, there was no countervailing testimony or evidence contradicting the occurrence of the actions depicted in the properly authenticated and admitted silent surveillance video footage. It was undisputed at trial that Johnson walked into Green's house on September 13 and that Green subsequently loaded various items, including a shovel as well as what appeared to be a large heavy object and red suitcases, into his truck before leaving for lengthy periods of time. Without any communicative content, the silent surveillance video footage at issue here is indistinguishable from a properly admitted series of crime-scene photographs, which have traditionally been made available for review during jury deliberations without raising any concern of undue emphasis.

¶18 Green argues that the State imbued the footage at issue with "testimonial characteristics" raising concerns of undue emphasis by: (1) "enhanc[ing]" the video footage, (2) presenting detective testimony implying that investigators believed that the video showed Green carry a body out, (3) arguing in closing that the video showed Green

9

carrying a body out, and (4) "comparing [the footage] to a human eyewitness." However, Green fails to demonstrate how any of these factors heightened the risk that making this footage available to the jury during deliberations would lead to undue emphasis. Enlarging the portion of the video frame that captured Green's activities did not increase the risk of undue emphasis. The only activities captured by the camera frame that were relevant to the case occurred in Green's driveway. Green does not allege that the rest of the video frame—capturing the neighbor's front yard, the street, and residences neighboring to Green's—contained any relevant contextual information or countervailing evidence that would have supported a different interpretation of Green's activities and was therefore unfairly minimized by the picture-within-a-picture enlargement of part of the frame.[5]

¶19    However, Green argues that the State, by enlarging the portion of the frame containing Green's activities, tipped off the jury that it believed that the footage captured Green removing Johnson's body from the residence, thereby grafting testimonial assertions onto the footage. Green fails to show how this raises a concern of undue emphasis. It would not have been a surprise to anyone, least of all the jury, that the State and its investigators believed this footage to contain evidence of a homicide by Green, as the remainder of the State's evidence likewise sought to establish that Green had committed and attempted to cover up a homicide during the time captured by the video. Green's

---

[5] Green also does not argue that the video was edited in a misleading manner. Moreover, the record establishes that the State did not add any data to the file and merely enlarged the pixels on the relevant portion of the video and that the eventual display was only slightly brighter as incidental to a file transfer.

argument that the State thereby managed to tie its theory of the case to the video is a far cry from showing that any actual testimony or testimonial-in-nature materials were reviewable during deliberations, thereby leading to the potential for undue emphasis over other testimony on the same subject, the concern of the common law rule Green invokes. *See People v. Montoya*, 773 P.2d 623, 625-626 (Colo. 1989) (cited by *Christenson*, 250 Mont. at 361, 820 P.2d at 1310) (purpose of the rule generally barring unsupervised review of testimonial materials during deliberations to avoid artificially elevating the salience of some testimony to the "prejudice of other testimony *upon the same subject*" (emphasis added)). The fact that exhibits relate to and are consistent with testimony from various State witnesses is true for most pieces of evidence admitted in most trials and does not form the basis for excluding items of evidence from the jury deliberations. *Stout*, ¶ 32. Given that the video contained the last known sighting of Johnson before she disappeared, and Green's actions immediately thereafter, the emphasis placed on it at trial was appropriate.[6]

## CONCLUSION

¶20 The silent security camera footage capturing Green's behavior following Johnson's disappearance was equivalent to a series of crime-scene photographs and was neither testimonial in nature nor carried any substantial risk of undue emphasis. It was not an

---

[6] Finally, Green argues that the video footage was "ripe for misinterpretation," because the object Green carried out of the garage that the State contended in closing was Johnson's body was indiscernible in the blurry footage. However, that the evidence was capable of multiple interpretations—which it is within the purview of the fact-finder to resolve—does not establish that it will receive undue emphasis.

abuse of discretion for the District Court to provide the jury with unrestricted access to this footage during deliberations.

¶21    Affirmed.


/S/ MIKE McGRATH


We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE