FILED

December 14 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

IN THE SUPREME COURT OF THE STATE OF MONTANA

OP 10-0288

2010 MT 263

_____

STATE OF MONTANA,

        Petitioner,

    v.

DISTRICT COURT OF THE EIGHTEENTH
JUDICIAL DISTRICT OF MONTANA, GALLATIN
COUNTY, THE HONORABLE MIKE SALVAGNI,
Presiding Judge,

        Respondent.

O P I N I O N
A N D
O R D E R

_____

¶1     Before this Court is a Petition for a Writ of Supervisory Control (Petition) filed by the State of Montana in *State v. Anderson*, Cause No. DC-09-33AX, which is pending in the Eighteenth Judicial District Court, Gallatin County. The Petition challenges a pretrial ruling by the District Court suppressing certain evidence which the State intended to introduce at trial in the prosecution of defendant Shanara Anderson for deliberate homicide. The State contends that the District Court's decision was based on a mistake of law and is causing a gross injustice, and the State therefore asks this Court to exercise supervisory control and to reverse the District Court's ruling.

¶2     In its Petition, the State relied primarily on the transaction rule (§ 26-1-103, MCA) in arguing the admissibility of the evidence at issue. However, because we perceived that the issue of admissibility also inevitably raised the questions of the scope and

1

applicability of Rule 404(b) of the Montana Rules of Evidence, we ordered more extensive briefing on these questions. *See* M. R. App. P. 14(7)(b). The State has now filed its supplemental brief, and Anderson has filed a response.

¶3     Having considered the parties' arguments, we grant the Petition, reverse the District Court's April 2, 2010 order suppressing the evidence in question, and remand for further proceedings consistent with this Opinion and Order. Furthermore, in light of the parties' respective arguments and the circumstances which necessitated the State's filing of the Petition, we have reevaluated the rule first articulated in *State v. Just*, 184 Mont. 262, 268-69, 274, 602 P.2d 957, 961, 963-64 (1979), and subsequently modified in *State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991), known as the Modified *Just* Rule. After detailed review and analysis, we conclude that the rationale underlying *Just* and *Matt* rested on a misunderstanding of Rule 404(b). This, in turn, has led to increasing uncertainty in the application of the "other acts" rules, as well as numerous appeals to this Court. In similar situations, we have clarified or revised our approach with respect to the given legal issue.[1] We do the same here and, accordingly, overrule *Just* and *Matt* and set forth a new approach in their place.

---

[1] *See e.g. State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735 (clarifying the test for harmless error); *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815 (revising the analysis of speedy trial claims); *State v. Ashby*, 2008 MT 83, 342 Mont. 187, 179 P.3d 1164 (revising the standard for reviewing conditions of sentence); *State v. Schneider*, 2008 MT 408, 347 Mont. 215, 197 P.3d 1020 (clarifying the scope of the right to counsel under Article II, Section 24); *Beach v. State*, 2009 MT 398, 353 Mont. 411, 220 P.3d 667 (clarifying the procedure for evaluating alleged newly discovered evidence); *State v. Taylor*, 2010 MT 94, 356 Mont. 167, 231 P.3d 79 (clarifying the test for plain error review); *State v. Gunderson*, 2010 MT 166, 357 Mont. 142, 237 P.3d 74 (clarifying the procedure for sentencing persistent felony offenders).

**ISSUES**

¶4 The questions presented are:

1. Are the issues raised by the Petition appropriate for resolution by this Court through a writ of supervisory control?

2. Was the State's evidence correctly deemed inadmissible?

**FACTUAL ALLEGATIONS**

¶5 At approximately 10:00 a.m. on January 10, 2008, Anderson called 911 and informed dispatch that her three-month-old daughter Vanyel was "white as a sheet" and not breathing. Medical personnel responded to the Bozeman apartment where Anderson and Vanyel were staying but were unable to save Vanyel's life.

¶6 Detectives with the Bozeman Police Department commenced an investigation into Vanyel's death and ultimately concluded that Anderson was responsible. Accordingly, on February 4, 2009, the State filed an Affidavit of Probable Cause and Motion for Leave to File Information charging her with deliberate homicide. In its affidavit, the State asserted various facts (obtained through witness interviews and the postmortem examination) in support of the charge. In summary, those factual allegations are as follows.

¶7 Vanyel was born in Glendive, Montana, in September 2007. According to a nurse who cared for Anderson and Vanyel following Vanyel's birth, Anderson would not look at Vanyel, would not hold her, and did not want to spend any time with her. When the nurse asked Anderson how she was doing, Anderson stated that she was "pissed off" because "[i]t's a girl, and I really wanted a boy and so does my significant other."

3

¶8 Anderson stayed with her friend Amanda once or twice a week. Amanda told investigators that she had observed Anderson, on several occasions, rolling Vanyel in a blanket so tightly that Vanyel would have difficulty breathing and would gasp for air. Amanda also described an incident one night when Anderson screamed at Vanyel to "shut the fuck up." In addition, Amanda reported that on the morning of January 9, 2008 (the day before Vanyel died), Anderson appeared tired and acted aggressively due to Vanyel's persistent crying. Amanda noted that Vanyel's father, Matt, had left Anderson about a month after Vanyel was born.

¶9 Another friend, Jessica, described Anderson as caring a lot for Matt. She stated that when Anderson and Matt had problems, or when he would call and upset her, Anderson had "a small tendency to take it out on the children." Jessica recalled an incident in which she saw Anderson get angry in response to Matt. Anderson was changing Vanyel's diaper and set Vanyel down "with enough force that her head actually bounced off the floor." Jessica also described incidents when Anderson would wrap Vanyel in a blanket so tightly that Vanyel would have trouble breathing. When Jessica unwrapped Vanyel, she could see the imprint of Vanyel's hands on her chest and knee prints on her stomach.

¶10 Investigators also spoke with Jeff, one of Anderson's old high school friends, who lived in Bozeman. Jeff told detectives that he had proposed to Anderson over the phone on January 5, 2008, and then drove to Glendive on January 8 to pick up Anderson, Vanyel, and Vanyel's two-year-old sister (Sister). The four departed for Bozeman the following day (January 9), arriving at around 6:30 p.m. According to Jeff, they went to

4

bed at around 11:00 p.m. Then, at around 1:00 a.m., Vanyel woke up crying. Anderson appeared a little agitated and went to check on Vanyel. She was gone for approximately five minutes, and the crying stopped abruptly. When Anderson returned to bed, she told Jeff that she had thrown a leather jacket over Vanyel's bassinette. Jeff did not hear any crying the rest of the night. He got dressed at around 6:30 a.m. and left for work at around 7:00. He told investigators that he could hear Vanyel breathing and observed the leather jacket still covering the bassinette when he left.

¶11 As noted, Anderson called 911 at approximately 10:00 a.m. and reported that Vanyel was not breathing. A portion of the transcript of this call is set out in the State's affidavit of probable cause. Notably, Anderson implied that Sister was responsible for Vanyel's death. Anderson told the dispatcher: "I just got up cause I heard my oldest and she'd climbed out of her playpen. And I saw that my leather jacket *(INAUDIBLE)* was on um, the end of the bassinette cause I have the top part of the bassinette on the floor." A bit later, Anderson added: "I didn't even know that my two year old could even climb out of the playpen. And that's what I'm afraid of happened."

¶12 Emergency medical responders transported Vanyel to the hospital, where she was pronounced dead. In the meantime, Anderson spoke with Detective Andy Knight while waiting for a ride to the hospital. She told Knight about the trip from Glendive to Bozeman the previous day and also recounted the events of that night, though her timeline differed from Jeff's in some important respects. Anderson stated that she went to bed at around 1:00 a.m. and that Vanyel started crying at around 6:30 a.m. According to Anderson, Jeff was still in bed at this time. Anderson picked up Vanyel, changed her

5

diaper, held her for awhile, and then went back to sleep. Anderson said that when she awoke, she saw Sister sitting on the end of the bed. She placed Sister back in her playpen and then looked down at Vanyel. Anderson stated that at this point, she saw the leather jacket on the end of the bassinette, which she insisted "was not laying on the bassinette when I went to bed" and "was not there this morning when I checked on her." Anderson removed the jacket and noticed that Vanyel was white and not breathing. She started CPR and then called her mother, who told Anderson to call 911. When Detective Knight inquired further about Anderson's concerns relating to the leather jacket, she responded: "I'm afraid that [Sister] may have accidentally put the coat on [Vanyel] and then pulled it off because she does take her blanket away."

¶13   Dr. Walter L. Kemp, Deputy State Medical Examiner, conducted a postmortem examination of Vanyel's body on January 11. The exam revealed a cerebral edema, which was "consistent [with] a delayed death following a lethal event." However, the absence of definitive neuronal necrosis suggested that "the time between the event and the final time of death was relatively brief." The exam also revealed multiple paraspinal rib fractures of varying ages, one of which appeared "acute" and "most likely occurred within hours of death." However, there was "no definitive evidence of a traumatic cause of death, such as the combination of subdural hemorrhage or hemorrhage within a body cavity." Dr. Kemp noted that rib fractures like those observed here "are indicative of non-accidental trauma, most likely due to compression of the chest, or . . . direct blows to the trunk." Thus, in Vanyel, the finding of multiple paraspinal rib fractures of differing ages "is, given the absence of other explanations, consistent with abuse." But Dr. Kemp

6

cautioned that Vanyel's death "cannot be definitively attributed to inflicted injuries based upon the autopsy findings alone." Ultimately, since "the infant has physical signs most consistent with abuse (based upon the findings and known history), but no evidence of lethal acute injuries (i.e., occurring just prior to the time of death)," Dr. Kemp concluded that the cause and manner of death are "undetermined." He noted, however, the following: that "the death of an infant at the hands of another person can occur without definitive autopsy findings, such as in a smothering or suffocation"; that the autopsy findings were "not consistent with a diagnosis of Sudden Infant Death Syndrome"; and that "no definitive natural cause of death was identified."

¶14 Based on the foregoing factual assertions, as well as additional facts alleged in the State's probable cause affidavit but not relevant to our analysis below,[2] the District Court granted leave to file the Information. Anderson entered a plea of not guilty and gave notice (as reflected in the Omnibus Hearing Order) that she would rely on general denial and might assert a defense of mental disease or defect. Thereafter, she filed a motion to dismiss the Information on the ground that the State's affidavit did not establish probable cause for the charge. The District Court denied the motion.

## PROCEEDINGS ON THE STATE'S *JUST* NOTICES

¶15 Relevant to our decision herein, it is necessary to describe in some detail the proceedings relating to the State's *Just* notices. *See Just*, 184 Mont. at 274, 602 P.2d at

---

[2] The State's affidavit recites statements that Anderson made to Detective Knight during a follow-up interview on January 11, 2008. However, the District Court has suppressed those statements as having been obtained unlawfully. The State initially appealed that ruling but later dismissed the appeal. Accordingly, Anderson's January 11 statements to Knight are not pertinent to the issues herein.

963-64; *Matt*, 249 Mont. at 142-43, 814 P.2d at 56. The State has charged Anderson with deliberate homicide under § 45-5-102(1)(a), MCA, which means the State must prove beyond a reasonable doubt that she "purposely or knowingly cause[d] the death of another human being." As noted, while the autopsy findings suggest that Vanyel's death was not due to natural causes or Sudden Infant Death Syndrome, there is no direct evidence establishing who caused it and how. But Dr. Kemp indicated in his report that "the death of an infant at the hands of another person can occur without definitive autopsy findings, such as in a smothering or suffocation," and the State has adopted this as its theory of how Vanyel died. Hence, the State intends to prove circumstantially that Anderson purposely or knowingly caused Vanyel's death by suffocating her.

¶16 To that end, the prosecutor filed a *Just* Notice listing certain evidence he planned to offer at trial. In summary, this evidence consists of the following: testimony about Anderson's attitude toward Sister and Vanyel, including her statement after Vanyel's birth that she wanted a boy; testimony concerning prior incidents in which Anderson allegedly abused Sister and Vanyel; testimony from different witnesses that Anderson wrapped Vanyel so tightly that she had difficulty breathing; testimony that when Sister was a baby, Anderson was told not to have extra blankets in the bed that could get in the way of her breathing and not to place her on her stomach because breathing problems could occur; testimony about Anderson's relationship with Matt (Vanyel's father); and testimony regarding the injuries Dr. Kemp observed during the postmortem examination. At the end of the *Just* Notice, the prosecutor provided a statement that this evidence was being offered "to show motive, intent, knowledge and lack of mistake as to the crime of

8

Deliberate Homicide." He noted, however, that in filing the notice he was not conceding that the evidence was subject to the Modified *Just* Rule. Rather, he explained, "the State . . . merely wishes to avoid any claim of surprise on the part of the defendant."

¶17 Anderson objected to the *Just* Notice on procedural as well as substantive grounds. First, she argued that the notice was defective. She pointed out that it consisted of eleven paragraphs describing an assortment of evidence, followed by a single statement listing various purposes for which the evidence was being offered. She criticized the notice for not providing a "statement matching up this list of purposes with the specific, and different, evidence identified in the preceding eleven paragraphs," thus leaving the reader to "guess" as to how each piece of evidence fulfills the listed purposes. Based on *State v. Dobson*, 2001 MT 167, ¶ 31, 306 Mont. 145, 30 P.3d 1077, *State v. Croteau*, 248 Mont. 403, 409, 812 P.2d 1251, 1254-55 (1991), *State v. Whitlow*, 285 Mont. 430, 440, 949 P.2d 239, 246 (1997), and *State v. Little*, 260 Mont. 460, 473-74, 861 P.2d 154, 162-63 (1993), Anderson asserted that it is insufficient for the State merely to list all of the possible uses of the evidence. Rather, she argued, the State must apprise the defendant as to how the evidence furthers the purposes stated in the notice. Anderson contended that by merely reciting a list of possible purposes at the end of his notice, the prosecutor had "impair[ed] her ability to challenge [the evidence's] admission."

¶18 Anderson further objected to the *Just* Notice on the ground that none of the listed evidence satisfied the substantive criteria of the Modified *Just* Rule, which are as follows: (1) the other crime, wrong, or act must be similar to the charged offense; (2) the other crime, wrong, or act must not be remote in time; (3) the evidence is not admissible to

9

prove the character of a person in order to show that she acted in conformity therewith; and (4) the evidence's probative value must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Matt*, 249 Mont. at 142, 814 P.2d at 56. Anderson argued that each piece of evidence failed to meet one or more of these criteria. In addition, she argued that some of the State's allegations were unsubstantiated or disputed and that there was insufficient proof to establish that the alleged prior acts of abuse had actually occurred.

¶19 In light of these arguments, the prosecutor filed an Amended *Just* Notice in which he attempted to cure the "technical objections" raised by Anderson. He deleted some of the evidence listed in the original notice, and he explained in greater detail that the remaining evidence listed in the amended notice was being offered to prove one or more of the following: identity (that it was Anderson, not Sister or Jeff, who caused Vanyel's death); knowledge (that Anderson knew of the risk of suffocation and knew that special care needs to be given to a child to avoid suffocation); motive (that Anderson was feeling frustrated and angry with her daughters, did not want Vanyel, and thus had a "motive to purposely or knowingly wrap Vanyel tightly to shut her up, causing her death"); intent (that Vanyel died as the result of a purposeful act); and absence of mistake or accident (that Vanyel's death was not the result of a mistake or accident).

¶20 The prosecutor also filed a separate response to Anderson's objections, making a couple of additional points. First, he observed that most of the conduct listed in the *Just* notices had been set forth in his affidavit of probable cause filed in support of his motion

10

for leave to file the Information—the point being that Anderson had been on notice from the outset that the State would likely seek to introduce some or all of the evidence now at issue. Second, he reiterated that the evidence was not necessarily subject to the Modified *Just* Rule. Rather, he argued, it was admissible—without prior notice—under the transaction rule. *See State v. Lozon*, 2004 MT 34, ¶ 12, 320 Mont. 26, 85 P.3d 753 (noting that the prosecution is not required to comply with *Just* and *Matt*'s notice requirement where the evidence at issue is admissible under the transaction rule).

¶21 Anderson disputed the prosecutor's analyses under both the transaction rule and the Modified *Just* Rule. She argued in her reply brief that the evidence did not satisfy the criteria of either rule but instead was "character evidence" being offered for a "propensity argument": to show that she "has a character for violence, as demonstrated by previous acts against her children, and therefore she must have acted in conformity with the character on the night of Vanyel's death"—an impermissible inference under Rule 404 of the Montana Rules of Evidence. Anderson also filed a motion to strike the prosecutor's Amended *Just* Notice as untimely. Section 46-13-109, MCA, provides that, except for good cause shown, notice of other crimes, wrongs, or acts must be given at or before the omnibus hearing, which in the present case was held May 11, 2009. With the agreement of Anderson, the District Court extended the deadline to May 15, and the prosecutor filed his original *Just* notice on that date. Anderson maintained that the original notice was defective, and she argued that the prosecutor could not file a corrected/amended notice after the May 15 deadline unless he made an affirmative showing of good cause for the belated filing. She contended that no such showing had been made.

11

¶22 The prosecutor countered that the purpose behind the notice requirement had been satisfied here. That purpose, he noted, is to prevent surprise and to allow the defendant to prepare for and respond to allegations of previous conduct. *See State v. Ayers*, 2003 MT 114, ¶ 89, 315 Mont. 395, 68 P.3d 768. In the present case, he observed,

> the Defendant was put on notice in the affidavit of probable cause in support of filing the information of the Defendant's previous conduct relevant to the charge. The original *Just* Notice filed on May 15, 2009, again specified the Defendant's prior conduct that was probative to the charge of Deliberate Homicide. Finally, the Amended *Just* Notice filed on October 30, 2009, specified the same conduct and clarified the purpose of the previous conduct.

The prosecutor noted that the Amended *Just* Notice had been filed five and a half months before the scheduled trial date, thus giving Anderson a reasonable opportunity to respond to the allegations of previous conduct.

¶23 With the issues so framed, the District Court took up the matter at a hearing on March 11, 2010. Anderson conceded that the reason for giving *Just* notice to the defense is to avoid unfair surprise, and she also conceded that she was on notice of the evidence that the prosecution sought to introduce. Nevertheless, she maintained that a showing of good cause by the State was necessary to preserve the integrity of the filing deadline and the "good cause" requirement. She opined that prosecutors otherwise could simply file a timely but inadequate "skeleton notice" and then later correct the deficiencies or tailor the notice based on the defense's objections. In response, the prosecutor acknowledged that his original notice was "possibly defective" under this Court's precedents because he had not assigned a specific purpose to each paragraph in the notice. When asked by the court why he had failed to do this, the prosecutor admitted that he had "screwed up." But he

explained that his amended notice was intended to cure that defect, and he argued that this constituted good cause for filing the amended notice after the deadline. Moreover, he reiterated that the purpose of giving notice—to prevent "trial by ambush" and give the defense an opportunity to raise any objections prior to trial—had been satisfied.

¶24 Turning to the admissibility of the evidence, the prosecutor acknowledged that under this Court's recent decision in *State v. Lacey*, 2010 MT 6, 355 Mont. 31, 224 P.3d 1247, the alleged acts of prior abuse involving Sister were not admissible under the transaction rule. *See Lacey*, ¶ 32 (holding that the defendant's sexual advances on other persons at other times were not "inextricably linked" to the charge of sexual intercourse without consent involving a different victim). But he asserted that the evidence of prior abuse against Sister was admissible under the Modified *Just* Rule, noting support for this argument in the *Lacey* concurrence. *See Lacey*, ¶¶ 35-36 (McGrath, C.J., specially concurring). As to Anderson's prior treatment of Vanyel, the prosecutor argued that this evidence was admissible under the transaction rule. Anderson, however, again argued that none of the evidence was admissible under either rule.

¶25 The District Court issued a Decision and Order addressing Anderson's objections to the *Just* Notice and her motion to strike the Amended *Just* Notice. First, the court observed that the original notice was "procedurally defective" under the authorities cited by Anderson (*see* ¶ 17, *supra*), as the prosecutor had tacitly conceded. Reasoning that it could not ignore the procedural requirements of § 46-13-109(1), MCA, and noting that this Court had previously enforced the "good cause" requirement of § 46-13-101(1), MCA, with respect to untimely defense motions, the District Court concluded that the

prosecution likewise must show "good cause" for filing an untimely amended *Just* notice. Finding that this showing had not been made, the court granted the motion to strike.

¶26 Next, having struck the Amended *Just* Notice, and having deemed the *Just* Notice procedurally defective, the court observed that the evidence in question would be allowed only if it were "inextricably linked to, and explanatory of, the charged offense" pursuant to the transaction rule. *See State v. Henson*, 2010 MT 136, ¶ 26, 356 Mont. 458, 235 P.3d 1274. The court ultimately decided that the only evidence which met this standard was Dr. Kemp's testimony concerning the single rib fracture close in time to Vanyel's death. The court reasoned that the other rib fractures and the prior abuse of Sister and Vanyel were not "explanatory of" the alleged homicide except through the "character inference" that "because [Anderson] abused her child, she must have acted in conformity with her [violent] character when she allegedly killed Vanyel."

¶27 Finally, although it had struck the Amended *Just* Notice for procedural reasons, the District Court addressed the evidence identified in that notice "because even if the Amended *Just* Notice is valid, the result would not differ from the consideration of the original *Just* Notice." Applying the substantive criteria of the Modified *Just* Rule, the court ruled that the evidence did not meet the first (similarity) and third (permissible purpose) criteria. Rather, the court concluded, the State wanted to use the evidence to make an impermissible propensity argument. Given this conclusion, the court did not reach the fourth criterion (balancing under Rule 403). The court ruled that none of the evidence identified in the *Just* notices would be allowed, except the evidence of a single rib fracture close in time to Vanyel's death.

14

## DISCUSSION

¶28  *Issue 1.  Are the issues raised by the State's Petition appropriate for resolution by this Court through a writ of supervisory control?*

¶29  This Court has general supervisory control over all other courts and may, on a case-by-case basis, supervise another court by way of a writ of supervisory control.  *See* Mont. Const. art. VII, § 2(2); M. R. App. P. 14(3).  Supervisory control is an extraordinary remedy, which we exercise only when (1) urgency or emergency factors exist making the normal appeal process inadequate, (2) the case involves purely legal questions, and (3) one or more of the following circumstances exist:  (a) the other court is proceeding under a mistake of law and is causing a gross injustice, (b) constitutional issues of state-wide importance are involved, or (c) the other court has granted or denied a motion for substitution of a judge in a criminal case.  *Lamb v. Fourth Jud. Dist. Ct.*, 2010 MT 141, ¶ 10, 356 Mont. 534, 234 P.3d 893.  We conclude that the present case is appropriate for the exercise of supervisory control under these factors.

¶30  First, the State may not appeal in a criminal case except in narrow, statutorily prescribed circumstances.  *See* § 46-20-103, MCA.  Under subsection (2)(e) of this statute, the State may appeal from any court order the substantive effect of which results in "suppressing evidence."  We have clarified, however, that orders "suppressing evidence" are "orders which exclude evidence on the grounds that the evidence has been illegally obtained," and do not include "pretrial orders which exclude evidence based on Rules of Evidence, such as relevancy, probative value, or statutory inadmissibility." *State v. Strizich*, 286 Mont. 1, 11, 952 P.2d 1365, 1371 (1997).  Because the order at

15

issue here falls into the latter category, there is no appeal process by which the State could obtain review of the order. *Cf. State v. Ninth Jud. Dist. Ct.*, 262 Mont. 70, 72, 863 P.2d 1027, 1028 (1993) (noting that the appeal process was inadequate because the State did not have the right under § 46-20-103(2), MCA, to appeal the order at issue).

¶31 Second, as the State routinely contends, evidentiary rulings are generally reviewed for abuse of discretion. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. In the present case, however, the State asserts that the District Court's evidentiary ruling was based on erroneous conclusions of law; and the State argues that where the rationale for excluding evidence is based on a conclusion of law, our review is "de novo, without deference to the district court." Thus, the State maintains that this case involves purely legal questions. Anderson, on the other hand, contends that the District Court's decision "is not 'purely' legal" because it involved a determination that the State had not shown good cause for filing the Amended *Just* Notice after the deadline. Citing *State v. Adkins*, 2009 MT 71, ¶ 21, 349 Mont. 444, 204 P.3d 1, she asserts that a decision on good cause, and the choice of remedy for failing to show good cause, are discretionary matters, not legal questions. We note, however, that the State is not challenging the District Court's "good cause" determination. Rather, the State's challenges to the District Court's decision are directed at legal conclusions which the District Court reached based on its interpretation of various statutes and rules. It is well-established that the interpretation and construction of a statute or rule is a matter of law, which we review de novo to determine whether the district court's interpretation and construction of the statute or rule

16

is correct. *Derbyshire*, ¶ 19; *State v. Brown*, 2009 MT 452, ¶ 6, 354 Mont. 329, 223 P.3d 874. Thus, we conclude that this case involves purely legal questions.

¶32   Lastly, as explained under Issue 2 below, we conclude that the District Court is proceeding under a mistake of law. Furthermore, pursuant to the court's ruling, the vast majority of Dr. Kemp's autopsy findings (and, correspondingly, any opinions based on those findings) have been suppressed, as has all of the evidence the State planned to use to establish identity, intent, motive, knowledge, and absence of mistake or accident. The exclusion of this evidence, in conjunction with the suppression of Anderson's statements to Detective Knight on January 11, 2008 (*see* ¶ 14 n. 2, *supra*), has left the State with essentially no evidence with which to prosecute the charge. Under these circumstances, we conclude that the aforementioned mistake of law is causing a gross injustice.

¶33   We accordingly exercise supervisory control over this case.

¶34   ***Issue 2. Was the State's evidence correctly deemed inadmissible?***

¶35   At the outset, we note that certain facets of the District Court's decision—in particular, those relating to the notice requirement—are supported by extant precedent. The problem is with the precedent itself, which has resulted in the mistake of law and gross injustice that prompted our exercise of supervisory control in this case.

¶36   Recent cases have demonstrated that the rules we articulated in *Just* and *Matt* are not effectively serving the purposes for which they were adopted. To the contrary, these rules have given rise to needlessly technical notice requirements, created uncertainty and inconsistency in the analysis of alleged character evidence, and led to the wrongful exclusion of evidence in some cases. The reason is that the procedures and tests that our

cases have imposed on the prosecution and the defense are not true to the purposes of Rule 404(b), which has never included a notice requirement and does not require satisfaction of all the criteria set out in the Modified *Just* Rule.

¶37 Not surprisingly, when a rule is or becomes unworkable, practitioners will find a way to avoid the rule. Notably, during the hearing in the District Court, the prosecutor explained that he "rare[ly]" files a *Just* notice but did so in the present case "out of an abundance of caution and also fear of a ruling [like] we had in *Lacey*," where this Court rejected the prosecution's reliance on the transaction rule for admitting the evidence at issue (*see* ¶ 24, *supra*).[3] In this regard, the State points out that the line between so-called "intrinsic" or "transaction" evidence and "extrinsic" or "404(b)" evidence is sometimes "blurred," which in turn necessitates the sort of caution exercised by the prosecutor here. Yet, his efforts ultimately were in vain for the reasons detailed above.

¶38 The problems we see coming up repeatedly in our cases have culminated in the present case, which demonstrates how far afield our jurisprudence in this area has gone. The evidence at issue here was excluded based on technical requirements that serve no practical purpose and should not have existed in the first place. Accordingly, as stated at the outset, we revisit *Just* and *Matt* and, for the reasons explained below, overrule these cases.

## A. Notice Requirement

¶39 We start with the notice requirement. In *Just*, this Court discussed the following "general rule" and its exceptions, which had evolved in our caselaw up to that point:

---

[3] Like the present case, *Lacey* originated in the Eighteenth Judicial District.

Generally, evidence of other offenses or of other similar acts at other times is inadmissible for the purpose of showing the commission of the particular criminal offense charged. . . .

The general rule, however, is subject to several exceptions when such evidence becomes admissible: (1) When similar acts with the same prosecuting witness are involved; (2) when similar acts are not too remote in time; and (3) when evidence of other offenses tends to establish a common scheme, plan or system, where such other offenses are similar to, closely connected with and not too remote from the one charged, and where they are so that the proof of one tends to establish the other.

184 Mont. at 267-68, 602 P.2d at 960 (internal quotation marks omitted).

¶40     After determining that the evidence at issue was admissible under the exceptions, the *Just* Court noted concern "with the possibility that the exceptions . . . may 'swallow up' the general rule." *Id.* at 271, 602 P.2d at 962. Thus, the Court adopted three procedural safeguards, one of which requires advance notice from the prosecution:

Evidence of other crimes may not be received unless there has been notice to the defendant that such evidence is to be introduced. The procedures set forth in section 46-18-503 MCA [relating to notice of persistent felony offender status] should serve as guidelines for the form and content of such notice. Additionally, the notice to the defendant shall include a statement as to the purposes for which such evidence is to be admitted.

*Id.* at 274, 602 P.2d at 963-64. The Court reasoned that such notice was needed because this type of evidence has the potential to be highly prejudicial. *Id.* at 271-72, 602 P.2d at 962. Moreover, the Court observed, the defendant "looks to the information to ascertain the charge that he must be prepared to meet. If he may be subjected to evidence of his conduct many years before the time named in the information he will be taken by surprise and the issues would be multiplied indefinitely, without previous notice to the defendant, and greatly to the distraction of the jury." *Id.* at 273, 602 P.2d at 963 (internal quotation marks omitted). Finally, the Court noted that the State is required to inform a defendant

of its intent to present evidence of prior felony convictions in seeking increased penalties under the persistent felony offender statute, and the Court reasoned from this that "[a] defendant who may have to refute evidence of past acts or offenses, not specifically charged, should be accorded the same notice." *Id.* at 273, 602 P.2d at 963.

¶41 Twelve years later in *Matt*, we reaffirmed the requirement that

> [e]vidence of other crimes, wrongs or acts may not be received unless there has been written notice to the defendant that such evidence is to be introduced. The notice to the defendant shall specify the evidence of other crimes, wrongs or acts to be admitted, and the specific Rule 404(b) purpose or purposes for which it is to be admitted.

249 Mont. at 142-43, 814 P.2d at 56. As Anderson pointed out in the District Court, subsequent decisions have refined this requirement such that it is not sufficient for the prosecutor merely to specify the evidence and the specific purposes of the evidence. The prosecutor must also "apprise the defendant as to why the evidence [is] admissible under the purposes stated," *State v. Whitlow*, 285 Mont. 430, 440, 949 P.2d 239, 246 (1997), and " 'articulate precisely the evidential hypothesis by which a fact of consequence may be inferred' " from the evidence, *State v. Dobson*, 2001 MT 167, ¶ 31, 306 Mont. 145, 30 P.3d 1077 (quoting *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982)).

¶42 As the proceedings in the present case illustrate, however, these technical notice rules have created a battle for prosecutors that they should not have to fight. Indeed, insofar as the notice requirement is concerned, the *Just* Court invented a solution for a nonexistent problem. To be sure, an accused has the right to prepare a defense to a criminal charge. *State v. Couture*, 2010 MT 201, ¶ 77, 357 Mont. 398, 240 P.3d 987. And, to that end, the accused must be given notice of the charge itself. *See State v.*

*Goodenough*, 2010 MT 247, ¶ 20, ___ Mont. ___, ___ P.3d ___. Furthermore, included in the right to prepare a defense, the accused must have reasonable notice of the evidence the State intends to introduce at trial. But such notice is largely accomplished through the discovery statutes (Title 46, chapter 15, part 3, MCA), which require the prosecution "to disclose to the defendant in discovery the witnesses it intends to call and the evidence it intends to introduce." *State v. Stout*, 2010 MT 137, ¶ 46, 356 Mont. 468, 237 P.3d 37 (citing § 46-15-322, MCA); *see also State v. McKeon*, 282 Mont. 397, 403, 938 P.2d 643, 647 (1997) ("Sections 46-15-322 and -323, MCA, require the prosecution and the defense to disclose all relevant information in order to 'provide notice and prevent surprise.' "). Admittedly, the discovery statutes in effect at the time *Just* was decided were not as comprehensive as they are now. But the point is that under current discovery rules, the prosecution must disclose the evidence it may introduce at trial, and this requirement undercuts any need there may have been for a separate notice requirement for extrinsic evidence. Also, it should be noted that the defendant is on notice of the factual matters alleged by the prosecutor in support of filing the charge. *See* §§ 46-11-110, -201(2), MCA. In the present case, for example, the affidavit of probable cause identified most of the evidence now at issue, thus giving Anderson ample opportunity to raise objections to that evidence without the need for a separate notice.

¶43 The *Just* Court analogized to § 46-18-503, MCA (1979), as support for adopting a notice requirement. That provision, now codified at § 46-13-108, MCA (2009), requires the prosecution to give notice if it intends to seek treatment of the accused as a persistent felony offender (PFO). The notice must specify the alleged prior convictions so that the

21

defendant has an opportunity to raise objections to them before being sentenced. *See* § 46-13-108(2)-(4), MCA; *State v. Niederklopfer*, 2000 MT 187, ¶ 10, 300 Mont. 397, 6 P.3d 448, *overruled on other grounds*, *Whitlow v. State*, 2008 MT 140, ¶ 18 n. 4, 343 Mont. 90, 183 P.3d 861. But the defendant's criminal record will be provided to the court as part of the presentence investigation report regardless of whether the prosecutor is seeking PFO status. *See* § 46-18-112, MCA (1979 & 2009). Thus, the PFO notice requirement serves primarily to notify the defendant of the prosecutor's intent with respect to seeking a particular sentence. In contrast, as explained above, the evidence that the prosecution may use in proving the charge must be disclosed, upon the defendant's request, as part of discovery. Also, the defendant may be put on notice of some or all of that evidence through the charging documents. Where the prosecution discloses in the charging documents or through discovery the evidence it may introduce at trial, no practical purpose is served by requiring the prosecution to provide an additional, separate notice dedicated to extrinsic evidence.

¶44 On the other hand, requiring such a notice is problematic for a number of reasons. For one thing, it puts the prosecutor in the position of having to justify the admission of evidence in the absence of any objections by the defendant—something that is not required, for example, with suppression issues. If the prosecutor intends to introduce evidence seized during a search, or statements the defendant made in the course of an interrogation, he does not have to file a notice establishing the legality of the evidence or the statements in advance of any objection by the defense. Rather, the defense must first raise a challenge to the search or the interrogation and explain why it was unlawful, and

22

the prosecutor must then justify its legality in light of the defense's objections. *See* §§ 46-13-301, -302, MCA. Contrary to Anderson's contentions in the District Court, there is nothing inherently sinister in a prosecutor's tailoring his arguments *after* the defendant has raised her objections.

¶45 In contrast, *Just* and *Matt*'s approach encourages arguments and decisions based on form, rather than substance. It forces the prosecutor to anticipate what the defense objections might be. Most critically, he must identify any prosecutorial evidence that the defense might claim is extrinsic—i.e., "other crimes, wrongs, or acts" evidence—a task which our cases show is not always straightforward. And if he makes a mistake in this regard, then the defendant may obtain exclusion of the evidence, not because it was being offered for an improper propensity purpose, but because the prosecutor incorrectly concluded that the evidence was not extrinsic and, thus, failed to include it in his notice. Exclusion on this basis is untenable.

¶46 The only way to avoid this procedural trap is to prepare notices containing a laundry list of all the evidence that could potentially be deemed extrinsic. As noted, after identifying this evidence, the prosecutor must then sufficiently apprise the defendant as to why it is admissible. This approach has the potential to result in 50-page *Just* notices—which benefit no one—explaining why evidence, to which no objection has even been made, should be allowed. This scheme is injudicious and upsets the pretrial process. It also relieves defense counsel of her duty to diligently prepare a defense for her client, to seek discovery of the State's case, to determine which of the State's evidence may be inadmissible, and then to raise any viable evidentiary issues before trial. The defense

should not be permitted, as it is under current procedures, to sit back and wait for the prosecution to commit procedural missteps in giving notice of extrinsic evidence—of which the defense may already be aware—and then have that evidence excluded on grounds having nothing to do with whether the evidence is being offered for an improper purpose. We are not persuaded by Anderson's conclusory assertion in the District Court that a defendant's ability to challenge the admission of a particular piece of evidence is "impair[ed]" unless she is first told by the prosecution how that evidence furthers a nonpropensity purpose. A defendant is certainly capable of challenging prosecutorial evidence that she believes will lead the jury into an impermissible propensity inference, without first knowing what purpose the prosecutor has in mind for the evidence. In fact, it would be more sensible to have the defendant identify the evidence she believes is objectionable and then have the prosecutor show a legitimate nonpropensity purpose for which the evidence can be admitted.

¶47 Finally, while *Just* and *Matt* purport to implement Rule 404(b), this rule neither contains a notice provision nor creates a need for the sort of notice requirements those cases and their progeny impose. Under Rule 402, "[a]ll relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state." Rule 404(b), in turn, places a limitation on the admission of otherwise relevant evidence. It states that evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith" but may be admissible for other purposes. It is a frequent misconception that this rule bars *evidence*. It does not. It prohibits, rather, *a theory of admissibility*: using

24

evidence of other crimes, wrongs, or acts to prove the defendant's subjective character, disposition, or propensity (e.g., that she is inclined to wrongdoing in general, or that she tends to commit a particular type of wrongdoing) in order to show conduct in conformity with that character on a particular occasion. *See* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* vol. 1, § 2:19, 103-05 (rev. ed., West 1998) (discussing Federal Rule of Evidence 404(b)); *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (same).[4]  Essentially, Rule 404(b) disallows the inference from bad act to bad person to guilty person. *See* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* vol. 1, § 4:28, 746 (3d ed., Thomson/West 2007). The rule is available to a defendant who believes that certain prosecutorial evidence will lead the jury to draw this improper inference. And the defendant is free to raise that objection and request that the evidence be excluded under Rule 404(b). But it is absurd to suggest that the defendant is not able to make her objection without the prosecutor first identifying the problematic evidence for her and explaining the purposes to which he intends to put it.

¶48    It is true, as the Court noted in *Just*, that this type of evidence has the potential to be highly prejudicial. 184 Mont. at 271-72, 602 P.2d at 962; *see also State v. Derbyshire*, 2009 MT 27, ¶ 22, 349 Mont. 114, 201 P.3d 811 (discussing the dangers in admitting such evidence); *Old Chief v. United States*, 519 U.S. 172, 180-82, 117 S. Ct. 644, 650-51 (1997) (same). But that fact only establishes that the defendant should be made aware of

---

[4] Montana Rules of Evidence 402, 403, and 404 were modeled on, and are identical in relevant respects to, Federal Rules of Evidence 402, 403, and 404. *See* Commission Comments to Title 26, chapter 10, rules 402, 403, and 404, MCA (2010 Annotations). Thus, cases and treatises discussing these federal rules may be consulted as persuasive authority for purposes of analysis under their Montana counterparts.

the evidence in advance—which, as noted, can be accomplished through discovery—and afforded an adequate opportunity to prepare for and make objections to it prior to trial. It does not justify the current procedures under which the prosecution must divine which items of evidence the defense might find objectionable under Rule 404(b) and provide an analysis explaining why that as-yet-uncontested evidence should be allowed.

¶49   In sum, the notice requirements adopted in *Just*, *Matt*, and their progeny serve no useful purpose and are, in fact, inimical in many instances to the prosecution of criminal cases. As part of its obligations under the discovery statutes, the prosecution must disclose to the defendant, upon request, the witnesses it may call and the evidence it may introduce. *Stout*, ¶ 46; § 46-15-322, MCA. We hold that this disclosure requirement is sufficient to ensure that the defendant receives notice of any "other crimes, wrongs, or acts" evidence. For clarification, the requirement is simply to disclose the evidence; the prosecutor is not also required at the outset to explain why the evidence is admissible. Rather, it is up to the defendant to identify any of the State's evidence that she believes should be excluded as irrelevant (Rule 402), unfairly prejudicial (Rule 403), relevant only for an improper propensity inference (Rule 404), or inadmissible under some other rule, and to explain with argument and authority why the evidence should be excluded. This may be accomplished by means of a motion in limine. *See State v. Ankeny*, 2010 MT 224, ¶¶ 35-39, 358 Mont. 32, ___ P.3d ___. The prosecutor will then be required to respond to the defendant's objections and to demonstrate the evidence's admissibility. The court should conduct a hearing and issue a written decision with appropriate findings of fact and conclusions of law. If the court determines that the evidence is admissible,

the defendant may request an instruction under Rule 105.[5]  Lastly, if the prosecution fails to disclose any evidence pursuant to these procedures, then the defendant may request sanctions, including exclusion of the evidence, under § 46-15-329, MCA.  These procedures shall apply henceforth in place of those dictated by *Just* and *Matt*.

¶50    Before closing this discussion, it is necessary to address the statutory counterpart to *Just*'s notice requirement.  As noted, the Court held in *Just* that "[e]vidence of other crimes may not be received unless there has been notice to the defendant that such evidence is to be introduced.  The procedures set forth in section 46-18-503 MCA should serve as guidelines for the form and content of such notice."  184 Mont. at 274, 602 P.2d at 963-64.  In 1991, the Legislature enacted § 46-13-110, MCA, which established omnibus hearings and also codified *Just*'s notice requirement.  Subsection (3)(h) of the statute instructed the prosecution and the defense to be prepared at the omnibus hearing to discuss "notice of other crimes, wrongs, or acts, 46-13-503."  This codification contained a typographical error and, tracking *Just*, should have referred to "46-18-503," not "46-13-503" (which did not exist).   Actually, though, the Code Commissioner renumbered § 46-18-503, MCA, as § 46-13-108, MCA, in 1991.  Thus, subsection (3)(h) of the 1991 omnibus hearing statute should have stated:  "notice of other crimes, wrongs, or acts, *46-13-108*" (emphasis added).

¶51    These discrepancies were ironed out in 1993.  Furthermore, because § 46-13-108, MCA, concerns notice of intent to seek treatment as a persistent felony offender, the 1993

---

[5] "When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."  M. R. Evid. 105.

Legislature enacted § 46-13-109, MCA, as a discrete notice provision for other-acts evidence. Thus, § 46-13-110(3)(h), MCA, now instructs the prosecution and the defense to be prepared to discuss "notice of other crimes, wrongs, or acts, 46-13-109." Section 46-13-109, MCA, in turn, states in relevant part:

> (1) Except for good cause shown, if the prosecutor intends to use evidence of other crimes, wrongs, or acts pursuant to Rule 404(b), Montana Rules of Evidence, notice must be given at or before the omnibus hearing held pursuant to 46-13-110.
> (2) The notice must specify the other crimes, wrongs, or acts and must include a statement as to the purpose for which the evidence is to be offered.

¶52 As the preceding discussion reveals, however, the cases which this statute codified were in error, and the purposes which the statute purports to fulfill are likewise invalid. Because we have overruled *Just* and *Matt*, § 46-13-109, MCA, should be reconsidered and repealed by the Legislature. In the meantime, we observe that if the parties follow the procedures described above in ¶ 49, then the notice requirement of § 46-13-109(1), MCA, will have been satisfied in any event. Moreover, if the defense fails to request disclosure of the State's evidence but later complains that notice of other crimes, wrongs, or acts should have been given, then the prosecution may argue that the "good cause" exception of § 46-13-109(1), MCA, should apply. *See also* § 46-1-103(3), MCA ("Any irregularity in a proceeding specified by this title that does not affect the substantial rights of the accused must be disregarded.").

¶53 In the present case, Anderson received notice of the evidence now in dispute by virtue of the prosecutor's affidavit of probable cause and his two *Just* notices. As a matter of fact, she conceded in the District Court that she has notice of all the evidence

and that she has not been unfairly surprised. Furthermore, Anderson has had an adequate opportunity to raise objections to the evidence, and she in fact has done so. Indeed, the District Court excluded most of the evidence based on Anderson's arguments. The State challenges that ruling, while Anderson seeks to uphold it. We thus proceed with an analysis on the merits of whether the evidence is admissible.

## B. Admissibility of the Disputed Evidence

¶54 At the outset, we note that the State and Anderson have discussed the scope of the transaction rule in their briefs. However, this Court recently clarified the scope of the transaction rule in *State v. Guill*, 2010 MT 69, 355 Mont. 490, 228 P.3d 1152, *State v. Stout*, 2010 MT 137, 356 Mont. 468, 237 P.3d 37, and *State v. Sage*, 2010 MT 156, 357 Mont. 99, 235 P.3d 1284. Further clarification is not necessary to resolve the question of admissibility in the present case because we are only addressing the specific objections Anderson has raised to the evidence in dispute. Those objections are:

1. There is insufficient proof to establish that the uncharged acts occurred.

2. The evidence does not meet the similarity and remoteness criteria of the Modified *Just* Rule.

3. The evidence is being offered for an improper propensity purpose.

4. The evidence is unfairly prejudicial, would confuse the issues, or would be unnecessarily cumulative (relative to its probative value).

We address these points in turn.

## 1. Insufficient Proof

¶55 Anderson contends that the State should have to prove allegations of other crimes, wrongs, or acts by at least a preponderance of the evidence, and she asserts that the State

has not met that burden here. This is an important question—one that we left unresolved in *State v. Link*, 1999 MT 4, ¶ 24 n. 2, 293 Mont. 23, 974 P.2d 1124. However, in light of Anderson's subsequent arguments, we again decline to address the question as to what quantum of proof is sufficient for admitting other-acts evidence. Anderson argues that the prosecutor's proof is insufficient because the persons who witnessed the alleged abuse of Sister and Vanyel are all friendly with each other and no longer friendly with Anderson (the implication being that they are biased against Anderson) and because social workers investigated the reports of abuse and deemed them "inconclusive," "unfounded," or "unsubstantiated." These issues, however, go to the weight of the evidence. Anderson is certainly free at trial to cross-examine the witnesses and attempt to discredit their testimony, and she may also present evidence to refute the prosecutor's allegations that the abuse occurred. But the evidence is not inadmissible just because Anderson believes the witnesses are not credible.

## 2. Similarity and Remoteness

¶56 Next, Anderson contends that some of the State's evidence does not meet the Modified *Just* Rule's similarity and remoteness criteria. The Modified *Just* Rule, however, is no longer the correct analytical approach. Rather, when presented with a claim that evidence is being offered for an impermissible propensity inference, the court should simply apply Rules 402 and 404 (and, if requested, Rules 403 and 105). There is no requirement in Rule 404(b) that all uncharged acts must be "similar" and "near in time" to the charged act. Rather, these criteria are holdovers from our pre-Rule 404(b) jurisprudence and are not necessarily applicable to every nonpropensity theory of logical

relevance. These points were explained in ¶¶ 95-101 of the *Stout* dissent and need not be detailed again here. Suffice it to say that the prosecutor's theory of logical relevance may require that the uncharged act be similar to the charged act—e.g., if offered to identify the defendant by showing that she committed the uncharged act with a modus operandi strikingly similar to that of the charged act—but this will not always be the case. And the same is true about remoteness, which is an issue that bears more on the probative value of the evidence and, thus, should be considered in a Rule 403 analysis. In short, "similarity" and "nearness in time" are no longer prerequisites for the admission of all "other crimes, wrongs, or acts" evidence. Rather, when a defendant raises a Rule 404(b) objection, the trial court should carefully analyze whether the evidence in question is relevant for a purpose that does not involve drawing an impermissible inference of action in conformity with character. If it is, then Rule 404(b) does not require its exclusion.

### 3. Impermissible Purpose

¶57 Anderson contends that the State's evidence is being offered only to show that she acted in conformity with a bad character, which Rule 404 prohibits. The prosecutor's Amended *Just* Notice is the most recent listing of the evidence he seeks to introduce. During the District Court hearing, he struck paragraph 2, and the State also has indicated that it does not seek to admit the evidence in paragraph 9. Thus, we will address only the evidence listed in the remaining paragraphs of the notice. For ease of discussion, we analyze the evidence in seven separate categories, designated (a) through (g) below.

¶58 **(a)** In the first category, the prosecutor intends to introduce testimony regarding Anderson's lack of attention and personal contact with Vanyel following Vanyel's birth,

her statement that she was "pissed off" because "[i]t's a girl, and I really wanted a boy," and the fact that she once yelled at Vanyel to "shut the fuck up." He also intends to introduce testimony about the following alleged instances of abuse: in November 2007, Anderson slammed Vanyel's head into the floor in anger; on another date, she slammed Vanyel's head off the floor when Vanyel wouldn't eat; and on still another occasion, she became angry and bounced Vanyel's head off the floor while changing her diaper. The prosecutor argued that this evidence is admissible to show: motive (that Anderson was frustrated and angry and did not want Vanyel, and thus had a motive to cause her death), identity (that it was Anderson, and not Sister or Jeff, who caused Vanyel's death), intent (that Anderson acted purposely or knowingly), and absence of mistake or accident (that Vanyel's death was the result of a purposeful act and not an accident). Anderson argues that these purposes are inapplicable for four reasons.

¶59 First, she cites our decision in *State v. Sweeney*, 2000 MT 74, 299 Mont. 111, 999 P.2d 296, where we observed that "for evidence of prior crimes to be admissible to show motive or intent, 'the commission of the first crime or act should give rise to a motive or reason for the defendant to commit the second crime.' " *Sweeney*, ¶ 25 (quoting *State v. Weldy*, 273 Mont. 68, 75, 902 P.2d 1, 5 (1995)); *accord State v. Sadowski*, 247 Mont. 63, 72, 805 P.2d 537, 542 (1991). Anderson argues that it would be "nonsensical" to suggest that she wanted to harm Vanyel *because of* the alleged prior abuse. Yet, while this may be true, our statement of the law in *Sweeney*, *Weldy*, and *Sadowski* is incomplete, and thus is hereby clarified. In some cases, the uncharged act will indeed furnish the motive for the charged act. For instance, an uncharged theft may supply the motive to murder an

32

eyewitness to the theft.  *See* Imwinkelried, *Uncharged Misconduct Evidence* at § 3:16, 81.  In this situation, the uncharged act is cause, and the charged act is effect.  *Id.* at § 3:18, 101.  In other cases, however, the uncharged act *evidences the existence* of a motive but does not *supply* the motive.  Rather, the motive is cause, and the charged and uncharged acts are effects; that is, both acts are explainable as a result of the same motive.[6]  The prosecutor uses the uncharged act to show the existence of the motive, and the motive in turn strengthens the inference of the defendant's identity as the perpetrator of the charged act.  *Id.*  That is precisely what the prosecutor seeks to do here.

¶60      Second, Anderson cites *Sweeney*, ¶ 31, for the proposition that the charged and uncharged acts must be uniquely similar when proving identity.  This is true where the prosecutor's theory of logical relevance is modus operandi—a point we made in another decision cited by Anderson:  *State v. Kordonowy*, 251 Mont. 44, 49, 823 P.2d 854, 857 (1991) ("This identity exception is often used '[t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused.' " (brackets in *Kordonowy*) (citing *McCormick on Evidence* 449 (2d ed. 1972))).  *See also* Imwinkelried, *Uncharged Misconduct Evidence* at § 2:13, 77 (uncharged misconduct evidence may be used "to identify the defendant by showing that the defendant committed an uncharged act with a modus operandi strikingly similar to that of the

_____

[6] Professor Imwinkelried provides the following illustration:  "[S]uppose that the defendant previously assaulted the victim.  The assault tends to show the defendant's hostile feelings toward the victim.  The defendant is subsequently charged with arson of the victim's property.  The preexisting hostile feelings could serve as the motive for the arson. . . .  Although most of the published opinions involve the motive to commit a violent crime, the preexisting hostility may furnish the motive for any type of crime which injures the victim in some way."  *Id.* at § 3:18, 101 (footnotes omitted).

charged act"); *id.* at § 3:10, 47-48. But this is not true for all theories. For instance, a dissimilar act showing consciousness of guilt—e.g., attempting to bribe the jurors in her trial—can be evidence that the defendant is the perpetrator of the charged act of murder. *See id.* at § 3:04, 9-11 (citing additional examples). Likewise, here, Anderson's prior abuse of Vanyel, in conjunction with her other conduct and statements reflecting that she resented and did not want Vanyel, show that she had a motive to cause Vanyel's death, which strengthens the inference that she is the perpetrator of the charged homicide.

¶61 Third, Anderson contends that the "absence of mistake or accident" purpose is "premised on the notion that a person who repeatedly engages in the same act over and over is more likely to possess intent if they claim they engaged in the act inadvertently, and also to show that the person is more likely to know the consequences of the act." We agree that these are two theories for introducing evidence of uncharged acts to show that the charged act was not due to mistake or accident; however, Anderson cites no authority that these are the *only* theories. Moreover, she argues that since she has never admitted to suffocating Vanyel, the State does not need to refute a claim that the lethal act was inadvertent. But, as the State points out, Anderson in fact did suggest to authorities that Vanyel's death was accidental, and we agree with the State that the prosecutor may introduce evidence of her prior mistreatment of Vanyel in order to rebut this implication.

¶62 Lastly, in arguing that the evidence is highly probative of Anderson's mental state, the prosecutor quoted from two pattern jury instructions (Montana Crim. Jury Instr. 2-108 and 1-017(b)) which together stand for the principle that a defendant's mental state, including her purpose and knowledge, ordinarily may not be proved directly, but may be

34

inferred from what the defendant does and says and from all other facts in evidence that are indicative of her state of mind. Anderson counters that the propensity inference of the evidence "predominates" over the intent inference. However, even assuming, for the sake of argument, that this is true, Rule 404 does not bar evidence because a propensity inference "predominates." Rather, it simply prohibits using the evidence for that purpose (i.e., to show action in conformity with character), and Rule 105 provides the mechanism through which the jury can be so instructed. Anderson's "predominates" argument is more appropriately considered in the context of a Rule 403 analysis.

¶63   In sum, Rule 404 does not require exclusion of this category of evidence.

¶64   **(b)** Next, the prosecutor plans to introduce testimony that in March 2006, when Sister was three months old, Anderson was instructed not to have extra blankets in her bed that could get in the way of her breathing and not to place Sister on her stomach due to breathing problems that could occur. The prosecutor also plans to introduce testimony that Anderson was advised against wrapping Sister so tightly that she could not breathe. He proposes to use this evidence to show that Anderson had specific knowledge about the risk of suffocation and how to avoid it, and also to demonstrate absence of mistake or accident. As an initial matter, the prosecutor argues that the evidence does not consist of "acts" by Anderson and that Rule 404(b), therefore, does not apply. To the extent the evidence shows only that Anderson was the recipient of advice on a particular subject, we agree that it is not evidence of an "act" by her. However, one could infer from this evidence that Anderson was mistreating Sister—e.g., by wrapping her so tightly that she could not breathe—thus prompting the advice Anderson was given. Also, Rule 404(a)

states that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion" (except in limited circumstances not applicable here), and this restriction applies to *any* evidence of character or a trait of character. Yet, the fact that Anderson was told not to do certain things which could result in suffocation, and any implicit suggestion that she was given this advice because she had been mistreating Sister, are not being offered to prove action in conformity with a bad character. Rather, this evidence is being offered to show Anderson's knowledge that special care needs to be given to a child to avoid suffocation and to establish absence of mistake or accident. It thus is not excluded by Rule 404.

¶65 **(c)** The prosecutor intends to introduce testimony about specific instances in which Anderson allegedly abused Sister, "including but not limited to" an incident in May 2006 in which she placed Sister face down in her crib with a blanket rolled up and tied to each side of the crib and the blanket placed on Sister's neck. The prosecutor asserted that while this evidence might not be "transactional" under *Lacey*, Rule 404 does not require its exclusion. *See* ¶ 24, *supra*. Initially, we note that because the prosecutor has described the circumstances of only one of the incidents of abuse involving Sister, we cannot determine whether the other incidents are inadmissible under Rule 404. The prosecutor will need to provide a more detailed explanation of those incidents on remand, and the District Court will have to conduct an analysis based on any objections Anderson raises. But with respect to the incident just described, the prosecutor argued (and we agree) that this evidence is admissible to show that Vanyel did not die accidentally. The fact that Anderson would place Sister face down in her crib with the blanket as described,

despite having been warned about the risks of suffocation, is relevant to her intent and to rebut the suggestion that Vanyel's death was accidental.

¶66 **(d)** The prosecutor also intends to introduce testimony that Anderson was observed on different occasions wrapping Vanyel up in a blanket so tightly that Vanyel either had difficulty breathing or could not breathe. This evidence is being offered to show motive, identity, intent, and absence of mistake or accident. For the reasons already discussed, we agree that these are legitimate purposes for the evidence. In addition, this evidence is also relevant to causation—i.e., to show that Vanyel's death was caused by being wrapped so tightly that she ultimately was suffocated.

¶67 **(e)** The next category consists of Dr. Kemp's findings and opinions based on his postmortem examination of Vanyel, including testimony about the various injuries he observed. This evidence goes directly to the issue of the cause of Vanyel's death and is admissible for this purpose. We also agree with the State that the evidence is relevant to identity, intent, and absence of mistake or accident.

¶68 **(f)** The prosecutor proposes to elicit testimony that when Anderson would become upset with things in her life such as "boyfriend" issues, she would take it out on her kids. This evidence, however, appears to involve an inference of conduct in conformity with a trait of character. The prosecutor has identified no use of this evidence that would not require such an inference. As such, it is barred by Rule 404(a).

¶69 **(g)** Lastly, the prosecutor also proposes to elicit testimony regarding Anderson's relationship with Matt (Vanyel's father). As Anderson points out, however, it is not clear what exactly this testimony would consist of. The prosecutor will need to provide a more

detailed explanation of the testimony on remand, and the District Court will have to conduct an analysis based on any objections Anderson raises.

### 4. Rule 403

¶70 Anderson asserts that the foregoing evidence is unfairly prejudicial, would confuse the issues, or would be unnecessarily cumulative (relative to its probative value) and thus should be excluded under Rule 403, which states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." At this point, however, we are not persuaded that any of the evidence should be excluded on these grounds. It is all highly probative of identity, causation, and intent. We recognize, though, that developments at trial may warrant a reexamination of this issue. Thus, Anderson is free at that time to renew her Rule 403 objection. She also may request a limiting instruction under Rule 105.

### CONCLUSION

¶71 In sum, *Just* and *Matt* are overruled, and we adopt in their place the procedures outlined above in ¶ 49. Anderson received notice of the evidence now in dispute, and she has raised objections to that evidence. None of the evidence reviewed above is excluded by Rule 404, except the evidence described in ¶ 68. The prosecutor will need to provide more specific disclosure of the evidence discussed in ¶¶ 65 and 69 before it can be analyzed. Finally, none of the evidence should be excluded at this time under Rule 403, but Anderson may renew her Rule 403 objection at trial.

¶72 We close with a word of caution. Our new approach is grounded in the Montana Rules of Evidence and applicable statutes. Accordingly, it will be incumbent on defense counsel to carefully scrutinize the charging documents and the prosecution's discovery disclosures and to make specific, legally supported objections, motions in limine, or requests for cautionary or curative jury instructions—which are, similarly, grounded in the Rules of Evidence and applicable statutes. It follows that it will be incumbent on the prosecutor to apprise the defendant fully, fairly, and accurately of all evidence which the State may offer at trial in its case-in-chief. It will remain for the trial judge to determine what evidence is admissible, and for what purposes, based on the objections, motions, and arguments made and to provide this Court with a sufficient rationale for appellate review of its decision.

¶73 Based on the foregoing,

¶74 IT IS ORDERED that the Petition for a Writ of Supervisory Control is GRANTED.

¶75 IT IS FURTHER ORDERED that the District Court's April 2, 2010 Decision and Order Re: Defendant's Motion to Strike Amended *Just* Notice and Objections to State's *Just* Notice is reversed.

¶76 IT IS FURTHER ORDERED that this case is remanded to the District Court for further proceedings consistent with this Opinion and Order.

¶77 The Clerk of this Court is directed to give notice of this Opinion and Order to counsel of record and to the Honorable Mike Salvagni, District Court Judge, presiding.

Dated this 14th day of December, 2010.

/S/ JAMES C. NELSON

We concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE
/S/ BRIAN MORRIS